Matthew A. Steward (#7637)
Shaunda L. McNeill (#14468)
Victoria B. Finlinson (#15103)
CLYDE SNOW & SESSIONS
One Utah Center, Suite 1300
201 South Main Street
Salt Lake City, Utah  84111
mas@clydesnow.com
slm@clydesnow.com
vbf@clydesnow.com
Telephone: (801) 322-2516
Fax No.: (801) 521-6280

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| SHADRACH ENNIS, SHAWN HARDING, NICOLAAS VANLEEUWEN, and TERRANCE JESCLARD, individually and on behalf of all others similarly situated, | Case No.  2:19-cv-00512 CW |
| | COLLECTIVE/CLASS ACTION |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| ALDER PROTECTION HOLDINGS, LLC, a Delaware limited liability company; ADAM SCHANZ, an individual; ADAM CHRISTIAN, an individual; KYLE DEMORDAUNT, an individual; DANE MCCARTNEY, an individual; and DOES I-X, | |
| Defendants. | |

## COLLECTIVE/CLASS ACTION COMPLAINT

### SUMMARY

Shadrach Ennis, Shawn Harding, Nicolaas Vanleeuwen, and Terrance Jesclard (collectively "Plaintiffs") individually and on behalf of all other similarly situated individuals ("Claimants"), bring this action against Alder Protection Holdings, LLC ("Alder" or the "Company"); Adam Schanz; Adam Christian; Kyle DeMordaunt; Dane McCartney, and Does I-X (collectively "Defendants").  This action is brought as a nationwide collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and as a class action under Fed. R. Civ. P. 23(b)(3) for violations of Utah's Payment of Wages Act, Utah Code § 34-28-1 *et seq.*; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; violation of the Utah Sales Representative Commission Payment Act, Utah Code § 34-44-101, *et seq.*; Retaliation under the FLSA, 29 U.S.C. 215(a)(3); Common Law Fraudulent Inducement; Common Law Fraud; Securities Fraud, Utah Code § 61-1-1, *et seq.*, Section 10(b) of the Securities and Exchange Act, and Rule 10(b); Unjust Enrichment; and Declaratory Judgment.

### JURISDICTION & VENUE

1. This Court has federal question jurisdiction under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiffs' and Claimants' state law claims under 28 U.S.C. § 1367 because they arise from the same case or controversy as the FLSA claims.

2. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District and Division.

3. Defendants are subject to personal jurisdiction in Utah.

2

{01518521-11 }

## THE PARTIES

4.     Shadrach Ennis is an individual currently residing in Salt Lake City, Utah. Mr. Ennis worked for Alder from approximately January of 2016 to February of 2019.  He served as a Junior Divisional Sales Manager from approximately 2017 to 2018.

5.     Shawn Harding is an individual currently residing in Houston, Texas. Mr. Harding worked for Alder from approximately the fall of 2013 to January of 2019.  He served as a Divisional Sales Manager from approximately 2017 to 2019.

6.     Nicolaas Vanleeuwen is an individual currently residing in Mobile, Alabama. Mr. Vanleeuwen worked for Alder from approximately March of 2016 to January of 2019. He served as a Divisional Sales Manager from approximately 2017 to January of 2019.

7.     Terrance Jesclard is an individual currently residing in Utah. Mr. Jesclard worked for Alder from approximately 2011 to 2018. He served as a Divisional Sales Manager from approximately 2011 to 2018.

8.     Defendant Alder Protection Holdings, LLC is a Delaware limited liability company with its principal place of business in Orem, Utah. Alder represents that it has business locations in all 50 states in the United States.

9.     Alder is engaged in the business of selling, installing, and servicing electronic security equipment.

10.     Adam Schanz is an individual believed to reside in Utah County, Utah. Mr. Schanz is the founder, owner, manager, and the Chief Executive Officer of the Company. At all relevant times Mr. Schanz was an "employer" as defined under the FLSA and the Utah Payment of Wages Act.  Mr. Schanz was actively involved in and exercised the authority to not pay Alder

{01518521-11 }

sales representatives the compensation owed to them. Mr. Schanz exercised control over hiring and firing and over the setting, payment, reduction and non-payment of compensation, wages, commissions, benefits. He also exercised control over the management decisions affecting the workforce.

11.     Adam Christian is an individual believed to reside in Utah County, Utah. Mr. Christian is the General Counsel of Alder. At all relevant times Mr. Christian was an "employer" as defined under the FLSA and the Utah Payment of Wages Act.  Mr. Christian was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them.  Mr. Christian exercised control over hiring and firing and over the setting, payment, reduction and non-payment of compensation, wages, commissions, benefits. He also exercised control over the management decisions affecting the workforce.

12.     Kyle DeMordaunt is an individual believed to reside in Utah County, Utah. Mr. DeMordaunt is the CFO of Alder. Among other things, Mr. DeMordaunt is responsible for the administrative, financial, and risk management operations of Alder, including the monitoring and preserving of company assets and financial results. At all relevant times Mr. DeMordaunt was an "employer" as defined under the FLSA and the Utah Payment of Wages Act.  Mr. DeMordaunt was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them.  Mr. DeMordaunt exercised control over hiring and firing and over the setting, payment, reduction and non-payment of compensation, wages, commissions, and benefits. He also exercised control over the management decisions affecting the workforce.

13.     Dane McCartney is an individual believed to reside in Utah County, Utah. Mr. McCartney is the President of Sales for Alder. Among other things, Mr. McCartney is

responsible for overseeing and managing the individuals that comprise Alder's sales force and their compensation, including the making and repayment of loans and advances. At all relevant times Mr. McCartney was an "employer" as defined under the FLSA and the Utah Payment of Wages Act.  Mr. McCartney was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them.  Mr. McCartney exercised control over hiring and firing and over the setting, payment, reduction and non-payment of compensation, wages, commissions, and benefits. He also exercised control over the management decisions affecting the workforce.

14.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as Does I-X.  Plaintiffs reserve the right to amend this Complaint when the identity of any Doe defendant is ascertained.

## NATURE OF THE ACTION

15.     Alder is a door-to-door sales company that relies on individual sales representatives to sell its alarm services and products on a commission basis to residential consumers throughout the United States.

16.     Alder recruits sales representative through false representations and then exploits them into working for little or no compensation.

17.     Alder incentivizes sales representatives to forego compensation at the time of the transaction with the customer in exchange for illusory promises of long-term wealth through the creation of books of accounts that will pay guaranteed returns to them in the future.

18.     In addition, Alder misrepresents commissions paid to sales representatives as loans and forces sales representatives to sign Promissory Notes ("Notes") and Confessions of

{01518521-11 }

Judgment ("COJs") for these fictional loans.  Alder then uses the Notes and COJs to retaliate against sales representatives who leave the Company and coerce sales representatives into continuing to work for Alder as essentially indentured servants.

19.     These exploitative practices are all part of Defendants' fraudulent scheme to profit from the sales representatives' talent and hard work without compensating them as required by both the law and the parties' contracts.

20.     This action is brought to recover damages from the Defendants' wrongful conduct, and to redress and end Alder's long-time pattern of willful and unlawful conduct.

21.     With regard to claims under the Fair Labor Standards Act ("FLSA"), Plaintiffs bring this action on behalf of themselves, and as a collective action on behalf of all other similarly situated sales representatives who are currently or were previously employed by Alder within the United States.

22.     With regard to all other causes of action, Plaintiffs bring this action on behalf of themselves, and a class action on behalf of all other similarly situated sales representatives who currently or previously worked for Alder within the United States.

## COMMON FACTUAL ALLEGATIONS FOR ALL CLAIMS

**A. Alder Induces Sales Representatives To Work As Door-to-Door Sales Representatives Based on Misrepresentations.**

23.     Alder uses door-to-door sales representatives to sell its products and services throughout the United States.

24.     The individuals who Alder recruits as door-to door sales representatives are typically college-age males who are recruited to work as independent contractors for Alder during the summer months.

6

25.     Alder then sends the college-age sales representatives to locations throughout the United States to sell Alder's products and services on a commission basis.

26.     Alder recruits sales representatives by, among other things, making representations regarding alleged achievements and income of certain individual sales representatives from prior sales seasons. A sample recruiting brochure is attached hereto as Exhibit A. Alder's published "2018 Sales Statistics" are attached hereto as Exhibit B.

27.     The information contained in Exhibit A, Exhibit B, and other similar recruiting messages is false and misleading in multiple respects, including the following:

    a.  Alder dramatically overstates the income earned by the individuals highlighted in Exhibit A, Exhibit B, and elsewhere in recruiting materials.

    b.  Alder represents to recruits and employees that a "book of business" is a fully vested form of compensation that a sales representative can "cash out" at any time. For example, Exhibit A states that "accounts you sell continue to generate value for you throughout their life." [Ex. A.]

28.     Alder representatives, including the Individual Defendants, also make misrepresentations during in-person recruiting conversations. For example, in or around March of 2016, Adam Schanz personally recruited Mr. Vanleeuwen by representing (1) that Mr. Vanleeuwen would earn $50,000 per month after his second summer sales season and (2) that as an example of Mr. Vanleeuwen's earning potential, a certain rising-star sales representative for Alder was earning $150,000 per month (even though this individual was actually earning $20,000 per month).

29.     Individual Defendants made repeated false statements about how sales representatives would build a "book of business" that would result in an income stream as well as have value that would be bought out.

30.     Individual Defendants also made repeated false statements about the amount of a sales representative's "book of business." For example:

a.    On or about December 12, 2018, Mr. Vanleeuwen sent a text message to Mr. Schanz inquiring about his "book of business." Mr. Schanz responded that Mr. Vanleeuwen was accruing $47,000 per month in total residuals. Mr. Schanz also represented that Mr. Vanleeuwen's "book of business" was worth over $3 million.

b.    Subsequently, in a declaration dated February 22, 2019, Mr. Schanz admitted that any representations regarding Mr. Vanleeuwen's "book of business" were literally false because "it would have only been for argument purposes and any actual amounts would be offset by expenses incurred by Alder in connection with each account and each sales representative on Vanleeuwen's team." He further admitted that "any such valuation was based on a hypothetical valuation if Alder were to find a buyer of its accounts . . . and that buyer paid a competitive multiple for each account."

c.    The information that Mr. Schanz admittedly omitted from his communications with Mr. Vanleeuwen—that the cited amounts did not include expense offsets and were based on a hypothetical valuation in a hypothetical transaction—was highly

8

material to the calculations themselves and to Mr. Vanleeuwen's decision to remain with Alder under the residual compensation plan.

31.     Plaintiffs and Claimants relied on these false and misleading recruiting messages in deciding to work for Alder and remain with Alder and in agreeing to the residual compensation plan described below.

**B.   Alder Uses Promissory Notes and Confessions of Judgment to Control, Intimidate, and Retaliate Against Its Sales Representatives.**

32.     Alder required Plaintiffs to sign Notes and COJs at the time they were hired by Alder and/or at various intervals throughout their relationship with Alder.

33.     Alder initially presented the Notes and COJs as standard onboarding and annual paperwork. However, if an employee did not immediately sign or requested an explanation, company representatives would become more insistent that the documents be signed.

34.     Dan McCartney and/or Adam Christian would personally call the employees and demand that they sign the baseless Notes and COJs or else their monthly payments would be cut off and their company cell phone (their primary vehicle for conducting business) would be shut down.

35.     For example, each time Mr. Vanleeuwen was required by Alder to sign a Note and COJ, he received a call from Mr. McCartney threatening that if he did not sign that very day, his compensation would be cut off. To the best of Mr. Vanleeuwen's knowledge and recollection, these calls occurred on or about March 23, 2016, December 14, 2016, September 21, 2017, and September 10, 2018.

36.     The Notes and COJs were drafted by Alder, with no opportunity for Plaintiffs or Claimants to negotiate.

9

37.     Alder never explained to Plaintiffs that Alder could use the documents to obtain a monetary judgment against them without giving them an opportunity to assert defenses to the alleged default or to dispute the amounts sought in the judgment.

38.     Alder did not advise Plaintiffs to have an attorney review or negotiate the terms of the Notes or COJs.

39.     Plaintiffs did not receive any benefit in exchange for signing the Notes and COJs. In most cases, the Notes and COJs reflected fictional loans that were never actually made to Plaintiffs. Alder maintains that the Notes and COJs secured advances made to Plaintiffs.

40.     In many cases, the Notes and COJs were sloppily prepared and contained errors.

41.     In some cases, the payment date was the same date on which the loan date identified in the Note. Kyle DeMordaunt stated in a declaration dated February 22, 2019, that "Alder intentionally made the payment date" on Mr. Vanleeuwen's September 21, 2017 Note to be September 21, 2017—the same date the Note was signed and the same date the loan was purportedly made.

42.     Mr. DeMordaunt explained in his declaration that "Vanleeuwen signed the Note and COJ in September, which is after the main sales season for Vanleeuwen and his sales team and is often the time, in Alder's experience, that its independent contractor sales representatives will terminate their relationship with Alder and switch to a competitor of Alder's. Therefore, Alder wanted the ability to immediately enforce the Note in the event that Vanleeuwen left Alder."

43.     Most of the Plaintiffs were forced to sign Notes and COJs for amounts that exceeded the total compensation provided to them by Alder during the term of their relationship.

10

For example, Mr. Vanleeuwen signed Notes and COJs for a combined amount of at least $717,000—more than the total amount of $616,130.02 that he received from Alder while providing services to the Company.

44.     The amounts paid to Plaintiffs were reported to the IRS on 1099 forms, triggering Plaintiffs' duty to pay income taxes on such amounts.

45.     The preparation and submission of these 1099 forms was inconsistent with Alder's position that the funds reported on the 1099 forms were loans or advances subject to repayment.

46.     Alder used the Notes and COJs to intimidate Plaintiffs and to prevent them from leaving the Company, thus creating a form of debt bondage.

47.     Alder also used the Notes and COJs to retaliate against Plaintiffs for leaving the Company and to intimidate other sales representatives who may be considering leaving the Company.

48.     Each of the Plaintiffs has been harmed as a result of Alder filing a COJ against them, which resulted in a judgment being entered before they were able to object or otherwise respond to the COJ. Plaintiffs have been forced to retain counsel in order to attempt to set aside the judgments.

49.     For example, a $53,000 judgment was entered against Mr. Vanleeuwen as a result of the Note and COJ that he was forced to sign on September 21, 2017. In support of the COJ, Dane McCartney filed with the Court a declaration stating that even though Vanleeuwen never received a loan in the amount of $53,000, he owed the company $553,153.31 based on certain advances. Mr. McCartney represented that Mr. Vanleeuwen "ha[d] not paid back to Alder any

portion of the $553,153.31 of Advances he received as a loan from Alder." However, Kyle

DeMordaunt subsequently filed a declaration in the same case, in which he stated that based on

Mr. Vanleeuwen's residuals, the $553,153.31 had been offset in the amount of $375,426.76.

50.      The Third District Court set aside the judgment against Mr. Vanleeuwen, finding

among other things that Alder had made misrepresentations to the Court regarding the amount

owed by Mr. Vanleeuwen and that the COJ and underlying Note were likely unconscionable and

otherwise unenforceable.

### C.  Alder Misclassifies its Sales Representatives and Installation Technicians as Independent Contractors.

51.      Alder's employment and compensation agreements with Plaintiffs state that they

are independent contractors.[1]

52.      However, Alder exercises a high degree of control over its sales representatives,

which is inconsistent with independent contractor status, including:

   a.  Plaintiffs were required to train and manage Alder representatives who sold

       Alder's products and services to customers.

   b.  Plaintiffs were required to work, and did work, far in excess of 40 hours per week,

       particularly during the summer sales season.

   c.  Plaintiffs were required to comply with Alder's instructions and policies,

       including its Code of Conduct, its Sales Rules, its Guidebook, and its A/V

       Recording Policy.

---

[1] Alder's agreement actually purports to classify its workforce as independent contractors "[e]xcept as otherwise required by applicable governmental authority for licensing, taxation or other purposes…"  It is axiomatic that Alder cannot classify its workforce one way for one self-serving purpose and another way for another self-serving purpose.

{01518521-11 }

d.   Plaintiffs were required to attend regular meetings at the direction of Alder, including weekly manager meetings and conference calls.

e.   Plaintiffs were required to request leaves of absence and receive approval from Alder before taking leave for any reason.

f.   Plaintiffs were required to perform services personally and could not contract out for their performance by others.

g.   Plaintiffs were required to provide services on behalf of and under the branding of Alder. Alder required them to wear a uniform polo shirt and identification badge with Alder branding.

h.   Plaintiffs were required to enter noncompetition agreements, which purport to prevent them from working for an Alder competitor during and for a period of time after the end of their relationship with Alder.

**D.  Alder Requires Sales Representatives to Sign Complex Compensation Agreements that Contradict Verbal Promises and Force Employees to Choose Between Forfeiting Accrued Compensation or Remaining with the Company Indefinitely.**

53.     Alder employs three levels of sales representatives: Rookie Sales Representatives, Experienced Sales Representatives, and Divisional Sales Managers.

54.     Alder requires each sales representative to enter an independent contractor agreement that provides for how the sales representative will be compensated.

55.     Alder's compensation plans involve two primary methods of compensation: commissions on sales made and residual equity interests in customer accounts ("Residuals").

13

56.     Most Rookie Sales Representatives and Experienced Sales Representatives are compensated under a hybrid compensation plan consisting of part commissions and part Residuals.

57.     Most Divisional Sales Managers are compensated entirely through Residuals.

58.     For example, one 2017 Divisional Sales Manager Agreement provides for three types of Residuals: Monthly Residuals, Override Residuals, and Sale Residuals, defined as follows:

> Monthly Residual. So long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, Alder shall pay Divisional with respect to each Eligible Residual Contract[2] personally generated by Divisional monthly residual compensation (the "Monthly Residual") out of the full MMR [monthly monitoring rates] actually collected (not billed) by Alder in respect of such Eligible Residual Contract an amount equal to the then applicable RCR[3] for such Eligible Residual Contract. Alder

[2] Under the 2017 Divisional Sales Manager Agreement, "'Eligible Residual Contract' means, as of the time of determination, a Residual Contract satisfying all of the following requirements: (i) all installation fees and monthly service and/or monitoring fees (other than fees outstanding for less than thirty (30) days) have been received or otherwise collected in full by Alder; (ii) the customer is currently satisfied with the installation, security equipment, monitoring services and all other services provided by Alder and/or the third-party monitoring company; (iii) the Contract has been properly documented and equipment installed in accordance with the then current Alder Policies; (iv) the Contract has not been cancelled or otherwise terminated and the customer has not requested to cancel or otherwise terminate the Contract; (v) when generated or otherwise first identified as a Residual Contract, the Contract was for an initial term of not less than forty-two (42) months; and (vi) the Contract is either an Auto-Pay Contract or a Qualified Invoiced Contract. For the avoidance of doubt, the following Contracts will not be deemed Eligible Residual Contracts: (A) Contracts that are submitted to Alder more than five (5) days after they are signed by the customer; (B) Contracts where the customer has not made at least one payment of the applicable MMR from the date of the installation of the security system; (C) Contracts that have any amounts owed Alder that are more than thirty (30) days past due; or (D) Contracts that that do not qualify as Residual Contracts.

[3] Under the 2017 Divisional Sales Manager Agreement, "'RCR' means, with respect to an Eligible Residual Contract personally generated by Divisional, the residual compensation rate (stated as a dollar amount) applicable to such Eligible Residual Contract and is equal to the positive remainder (or zero if the remainder is zero or less) of (i)the applicable Maximum RCR Amount, minus (ii) the positive remainder (or zero if the remainder is zero or less) of (A) the

{01518521-11 }

shall pay the Monthly Residual due Divisional for MMR collected on Eligible Residual Contracts during a calendar month on or before the twenty-fifth (25th) day of the following month. Alder's payment of Monthly Residual to Divisional shall be accompanied by a monthly report computing the Monthly Residual being paid and shall detail Divisional's Eligible Residual Contracts, the MMR actually collected thereon and the RCR payable with respect thereto.

Override Residual. So long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, Alder shall pay Divisional with respect to each Eligible Residual Contract personally generated by an Override Recruit a monthly residual override (the "Override Residual") out of the full MMR [monthly monitoring rates] actually collected (not billed) by Alder in respect of such Eligible Residual Contract the following applicable amount: (A) with respect to an Eligible Residual Contract generated by a First-Tier Recruit, $5.00; (B) with respect to an Eligible Residual Contract generated by a Second-Tier Recruit, $3.00; and (C) with respect to an Eligible Residual Contract generated by a Third-Tier Recruit, $1.00. Alder shall pay the Override Residual due Divisional for MMR collected on Eligible Residual Contracts during a calendar month on or before the twenty fifth (25th) day of the following month. Alder's payment of Override Residual to Divisional shall be accompanied by a monthly report computing the Override Residual being paid.

Sale Residual [for Existing Divisional Contracts]. Subject to Section 6(b)(iii)(C), so long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, upon the occurrence of a Contract Sale[4] of an Existing Divisional Contract,[5] Alder shall pay Divisional out of the Net Sales Proceeds from such Contract Sale an amount (the "Contingent Sale Residual") equal to the excess, if any, of (1) the Expected Sale Share,[6] over (2) the aggregate amount distributed to Divisional in respect of his

---

Eligible Residual Contract's Suggested MMR (as set forth on the Residual Contract Table) minus (B) the Eligible Residual Contract's actual MMR."

[4] Under the 2017 Divisional Sales Manager Agreement, "'Contract Sale' means the direct or indirect sale, exchange or transfer of a Contract by Alder or its affiliates to a third party (other than a transfers to Alder or any of its affiliates as determined by Alder in good faith)."

[5] Under the 2017 Divisional Sales Manager Agreement, "'Existing Divisional Contract' means an Eligible
Residual Contract personally generated by Divisional (taking into account of Section 6(c)) prior to the date hereof."

[6] Under the 2017 Divisional Sales Manager Agreement, "'Expected Sale Share' means, with respect to a Contract Sale of an Existing Contract, the amount that would be distributed to Divisional in respect of his Contract Participation if all Net Sales Proceeds from such Contract Sale were distributed to the equity holders of Parent (including Contract Participants) in respect of their equity in Parent in accordance with the terms of the LLC
Agreement."

{01518521-11 }

Contract Participation in such Contract Sale; provided, in no event shall the Contingent Sale Residual in such Contract Sale exceed the applicable Maximum Contingent Sale Residual. Alder shall pay the Contingent Sale Residual due Divisional with respect to a Contract Sale within fifteen (15) days after receipt of the Net Sales Proceeds in such Contract Sale. Alder's payment of Contingent Sale Residual to Divisional shall be accompanied by a report computing the Contingent Sale Residual being paid and any Purchase Price Adjustments (as defined below) applicable thereto.

<u>Sale Residual [for Eligible Residual Contracts]</u>. Subject to Section 6(b)(iii)(C), so long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, upon the occurrence of a Contract Sale of an Eligible Residual Contract personally generated by an Override Recruit, Alder shall pay Divisional out of the Net Sales Proceeds from such Contract Sale an amount (the "Override Sale Residual") equal to the product of (1) Divisional's Override Residual for such Eligible Residual Contract, multiplied by (2) the MMR [monthly monitoring rates] multiple used to determine the sales price of such Eligible Residual Contract in such Contract Sale (e.g., 30X multiple). Alder shall pay the Override Sale Residual due Divisional with respect to a Contract Sale within fifteen (15) days after receipt of the Net Sales Proceeds in such Contract Sale. Alder's payment of Override Sale Residual to Divisional shall be accompanied by a report computing the Override Sale Residual being paid and any Purchase Price Adjustments applicable thereto.

59.     Each form of Residual compensation is subject to Alder's "Sales Rules," which "set forth certain deductions to the compensation that Divisional may receive, and which set forth certain fees that may be charged to Divisional." Alder reserves the right to "modify, change or eliminate [the Sales Rules] from time to time upon one (1) business day's notice."[7]

60.     Notably, each form of Residual requires, as a condition of payment, that the sales representative be "actively engaged in providing the Services" or "subject to an Approved Absence." Thus, the Residual compensation is structured to prevent sales representatives from leaving Alder by requiring anyone who leaves to forfeit their hard-earned accrued compensation.

61.     Within Alder, a sales representative's Residuals are commonly referred to as one's "book of business."

---

[7] 2017 Divisional Sales Manager Agreement.

{01518521-11 }

62.     In printed recruiting advertisements, verbal recruiting pitches, and post-recruiting intracompany discussions, Alder represents that a "book of business" is a fully vested form of compensation that a sales representative can "cash out" at any time. [*See e.g.* Ex. A.]

63.     However, as set forth above, the fine print of the compensation agreements provide that Residuals are forfeited upon departure from the Company.

64.     The forfeiture upon departure stands in stark contrast to the recruiting promises that "accounts you sell continue to generate value for you throughout their life." [Ex. A.]

65.     Divisional managers are incentivized to defer compensation in order to build their Residual more quickly. Alder represents to its Divisional managers that by accepting a Residual-only compensation model with no monthly draw, they are building long-term wealth.

66.     For example, Mr. Ennis did not receive *any* cash compensation from Alder during the first eleven months he worked for the Company. Similarly, Mr. Jesclard did not receive any cash compensation from Alder during the first ten months he worked for the Company.

67.     Alder provided "invested capital reports" to its sales representatives who elected residual compensation plans, as stated in an email from Jason Summers to Mr. Vanleeuwen on October 25, 2018.

68.     In many cases, Alder promises certain bonus incentives to sales representatives who meet certain performance goals. However, once the performance goals are met, Alder adds the requirement that the sales representatives must re-sign for the following year in order to receive the incentives that were already earned.

17

**E. Alder Uses a Flawed, Nontransparent System of Tracking and Calculating Sales Representatives' Compensation and Retaliates Against Those Who Ask Questions.**

69. Radix is Alder's "sales representative portal." It purportedly contains Alder's Code of Conduct, Guidebook, Residual Sales Rules, and other policies. It also purportedly contains information regarding sales representatives' account generation and Residuals.

70. The account and sales information provided in Radix forms the basis for commission and residual calculations.

71. Throughout Plaintiff's tenure with Alder, Kyle DeMordaunt repeatedly stated to Plaintiffs (and other sales representatives) that Radix was a reliable and available source of information regarding their "books of business." Such statements were false; Radix was neither reliable nor consistently available.

72. Doug Kaufman, Vice President of Sales at Alder, admitted via text message to Mr. Vanleeuwen on October 9, 2018, that the residual information provided to sales representatives in Radix was incorrect.

73. When sales representatives request account generation or Residual information that is more accurate than what Radix provides, their requests are ignored or refused, and the sales representatives often face retaliation. For example:

a. On October 25, 2018, James Summers stated in an email to Mr. Vanleeuwen, "There are no other reports outside of Radix with residual amounts."

b. On October 26, 2018, Dane McCartney stated in an email to Mr. Vanleeuwen that he should make his request for residual information again "after backends."

c. On November 3, 2018, Mr. Vanleeuwen reiterated his request for "a comprehensive breakdown of my current residual" to Mr. McCartney, Mr.

18

Summers, Mr. DeMordaunt, and one other individual at Alder. His email was
ignored.

d.   Mr. Vanleeuwen then followed up by text message on November 7, 2018, with
Doug Kaufman, who the next day provided the excuse that no one could provide
the requested information because the Company had "switched monitoring
companies."

e.   Mr. Vanleeuwen followed up by text message on November 13 and 14, 2018,
with Mr. Kaufman, who told him to be "a little more patient."

f.   In December of 2018, Mr. Vanleeuwen's monthly payment amount was reduced.

g.   In January of 2019, Alder filed four COJs against Mr. Vanleeuwen and terminated
his employment.

h.   Mr. Vanleeuwen only received any information regarding his residuals after Alder
commenced legal action and Mr. Vanleeuwen retained legal counsel.

74.   Mr. Schanz has a practice of responding to requests for Residual information by
promising the requester that his "book of business" is worth several million dollars. Such
misrepresentations are made in an effort to pacify the requester and avoid follow-up requests.
For example, Mr. Schanz represented to Mr. Vanleeuwen in or around December of 2018 that his
book of business was worth $3 million.

75.   Alder hires an auditing firm to annually review Alder's records and determine the
"contractor receivable" for each sales representative as of the end of each calendar year. Alder
then sends an email to each sales representative stating the "contractor receivable" amount

without any documentation or explanation as to how the amount was calculated, what it means, or how it relates to the sales representatives' "book of business."

76.     The audit emails state that if the sales representative disagrees with the amount, they should furnish information to assist the auditors in reconciling the difference.

77.     When a sales representative responds to the audit emails, they receive no response. For example, Mr. Vanleeuwen responded to the audit emails each year asking what the "contractor receivable" represented and received no response.

78.     On information and belief, Alder has a practice of charging business expenses to the accounts of Divisional Managers while also claiming tax deductions for Alder for the same expenses.

**F. Alder Created an Unlawful Equity Plan in 2017.**

79.     The 2017 Divisional Sales Manager Agreements indicate that "Simultaneous with, but contingent upon, the execution of this Agreement, Divisional is being granted a Contract Participation in Alder Protection Holdings, LLC, a Delaware limited liability company and parent of Alder, pursuant to that certain Notice of Award and accompanying Award Agreement dated as of even date herewith, under the Alder Protection Holdings, LLC 2017 Residual Equity Plan." (Abbreviations removed.)

80.     In early 2017, Alder provided its Divisional Managers and other employees with a copy of the Residual Equity Plan (the "Plan").

81.     The Plan offers a security under federal and state law.

82.     On information and belief, Alder has never registered these securities in accordance with federal and state law.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

83.     Plaintiffs incorporate the preceding paragraphs by reference.

84.     Plaintiffs bring this action individually and as collective and class actions on behalf of Claimants, including all persons who are, or have been, employed by Alder as sales representatives within the applicable statutory period, and who, by means of the practices set forth above, failed to receive compensation owed to them or were otherwise harmed by Alder's tortious actions.

85.     Alder's officers and directors are excluded from the Class.

### *Collective Action Allegations: FLSA Claim*

86.     Plaintiffs seek certification on behalf of all Claimants of a collective action and the facilitation of notice to similarly-situated employees.  29 U.S.C. § 216(b).

87.     The FLSA requires employees to receive minimum wage and overtime compensation for workweeks at the regular payday for the period in which the workweek ends. 29 C.F.R. § 790.21(b).  Minimum wage and overtime earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends.  29 C.F.R. § 778.106.

88.     The FLSA requires employers to pay hourly employees at least minimum wage for all hours worked and one and one-half (1.5) the employee's regular rate of pay for all overtime hours worked in excess of 40 hours in a single workweek.  29 U.S.C. §§ 206 and 207.

89.     Employers have the burden to show that their employees qualify for an FLSA exemption from minimum wage and overtime requirements.

{01518521-11 }

90.     Employers who classify employees as exempt from minimum wage and overtime under the executive, professional or administrative exemptions must meet the salary basis test and must actually compensate their employees.

91.     Employers who classify employees as exempt from minimum wage and overtime under the outside sales exemption must treat their employees in the manner that outside sales employees are generally treated, including by rewarding them for their sales efforts through commissions and otherwise with high compensation.

92.     The members of the proposed FLSA Class would benefit from the issuance of a court supervised notice of the present lawsuit and the opportunity to join the present lawsuit as party plaintiffs (by filing written consent with the Court, pursuant to 29 U.S.C. § 216(b)).

93.      The members of the proposed FLSA Class are known to Alder, are readily identifiable, and can be located through Alder's records.

94.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs have submitted or will shortly submit their written consents to serve as party plaintiffs and to join the proposed FLSA Class.

### *Class Action Allegations for Other Claims*

95.     The other statutory and common law claims may properly be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

96.     The requirements of Rule 23 are satisfied, as set forth in the following paragraphs.

97.     **Numerosity:**  The total number of members of the proposed Utah state law class likely exceeds 300 individuals.  The members of the class are so numerous that joinder of all

members is impractical, and a class action is the only available method for the fair, equitable, and efficient adjudication of this controversy.

98.     **Commonality:**  There are common questions and issues of fact and law which predominate over any issues solely affecting individual members; specifically, whether Defendants, failed to pay compensation owed to the Plaintiffs and Claimants, fraudulently induced Plaintiffs to enter void or voidable contracts, committed securities violations, and committed the other torts alleged herein.

99.     **Typicality:**  The Plaintiffs' claims are typical of the claims of the proposed Class, in that each of these allegations pertains to Defendants' Company-wide policies and practices, not to their anecdotal treatment of individuals.

100.     **Superiority of Class Action:**  Since the damages suffered by members of the proposed Class (although not inconsequential) may be relatively small, the expense and burden of individual litigation by each member will likely make it impractical for the Class members to individually seek redress for the wrongful conduct alleged herein. Moreover, separate actions by each individual member of the proposed Class, and the resulting multiplicity of lawsuits, would cause undue hardship and expense for the Court and the litigants. Finally, the prosecution of separate actions would also create a risk of inconsistent rulings.

101.     **Adequacy:** The Plaintiffs in this class action are adequate representatives of the proposed Class, since the Plaintiffs' claims are identical to those of the proposed Class, and thus, the Plaintiffs have the same interests in this litigation as the members of the proposed Class. The Plaintiffs are committed to vigorous prosecution of this case, and have retained competent counsel who are experienced in litigation of this nature. The Plaintiffs are not subject to any

{01518521-11 }

individual defenses unique from those conceivably applicable to the Class as a whole. The Plaintiffs anticipate no management difficulties in this litigation.

102.    **Notice to the Proposed Class:**  The members of the proposed Class would benefit from the issuance of a court supervised notice of the present lawsuit. The members of the proposed Class are known to Alder, are readily identifiable, and can be located through Alder's records.  The notice to the proposed class members will include an introduction, a short description of the lawsuit including Plaintiffs' claims and Defendants' response to those claims, information on how to opt out of the lawsuit, a section informing potential class members that retaliation is not permitted if they are currently employed by Defendants, the effect of opting out of the lawsuit, and contact information for the class's counsel for any questions they may have, as well as a notice that this case is on a contingency fee with an explanation of what that entails and the amount to which the class's counsel is entitled if successful.  Along with the notice, we will attach an "Opt In" form for potential class members who choose to out into the FLSA Collective Action and an "Opt Out" form for potential class members who choose to opt out of the Class Action claims.

<u>**FIRST CAUSE OF ACTION**</u>

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, 29 U.S.C. § 201,**
***et. seq.* (Failure to Pay Minimum and/or Overtime Wage)**

**(All Defendants)**

103.    Plaintiffs incorporate the preceding paragraphs by reference.

104.    The FLSA regulates the payment of wages by employers whose employees are "engaged in commerce or engaged in the production of goods for commerce, or is employed in

an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1).

105.    Alder, Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are each employers within the meaning of 29 U.S.C. § 203.

106.    Defendants are required to adhere to the minimum and overtime pay requirements of the FLSA because Alder is an enterprise engaged in commerce and all of its employees are engaged in commerce.

107.    The practices described above in paragraphs 24, 32-48, 51-78, including but not limited to employee misclassification and the withholding and claw back of earned compensation, are company-wide practices that applied to sales representatives nationwide. These practices caused the Plaintiffs and proposed FLSA Class members to be deprived of regular and overtime pay.

108.    Plaintiffs and members of the proposed FLSA Class typically worked more than 40 hours per week; thus, much of the uncompensated work performed by the sales representatives was subject to overtime compensation.

109.    Defendants acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA.

110.    Plaintiffs and members of the proposed FLSA Class are entitled to the amount of unpaid regular and overtime wages beginning three years prior to the filing of this Complaint because Defendants acted knowingly and willfully and/or showed reckless disregard as to whether their conduct was prohibited by the FLSA.

111.    Plaintiffs and members of the proposed FLSA Class are entitled to recover the amount of unpaid regular and overtime wages and an award of liquidated damages equal to the same amount, as described by section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Plaintiffs and members of the proposed FLSA Class are also entitled to an award of prejudgment interest and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE UTAH PAYMENT OF WAGES ACT, UTAH CODE § 34-28-1, et seq.

### (All Defendants)

112.    Plaintiffs incorporate the preceding paragraphs by reference.

113.    Alder, Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are each employers within the meaning of Utah Code Ann. § 34-28-2 and 29 U.S.C. § 203.

114.    Defendants, in violation of UPWA, failed to pay wages to Plaintiffs and the members of the proposed Class by means of the practices described above in paragraphs 24, 32-48, 51-78.

115.    As a direct and proximate result of Defendants' violations of the UPWA, as set forth herein, Plaintiffs have sustained damages, including loss of earnings for hours of regular time worked for Alder, in an amount to be established at trial, in excess of $10,000 in the aggregate.

116.    Defendants have not acted in good faith nor with reasonable grounds to believe that their actions and omissions were not in violation of the UPWA.

117.    Plaintiffs and Claimants are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages under the UPWA.  Plaintiffs and Claimants are

26

also entitled to statutory damages pursuant to § 34-28-9.5(3)(b) and to an award of prejudgment interest and attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (Alder)

118.    Plaintiffs incorporate the preceding paragraphs by reference.

119.    The parties' written and oral agreements obligated Alder to make certain commission and other payments to Plaintiffs and Claimants, which Alder failed to make.

120.    Plaintiffs and Claimants fulfilled their obligations to Alder under the agreements.

121.    Plaintiffs and Claimants have been harmed by Alder's failure to pay commissions and other amounts owed to them and are entitled to damages in the form of the unpaid amounts, plus interest. Plaintiffs and Claimants are also entitled to attorney fees and costs.

### FOURTH CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Alder)

122.    Plaintiffs incorporate the preceding paragraphs by reference.

123.    The parties' written and oral agreements provided for Plaintiffs and Claimants to earn commissions and other payments through their work for Alder.

124.    Alder took improper actions with the purpose of preventing Plaintiffs and Claimants from receiving and/or retaining compensation for work performed under their agreements with Alder. Alder thus denied to Plaintiffs and Claimants the fruits of their agreements with Alder.

27

125.     Plaintiffs and Claimants have been harmed by Alder's failure to pay commissions and other payments owed to them and are entitled to damages in the form of the unpaid amounts, plus interest. Plaintiffs and Claimants are also entitled to attorney fees and costs.

## FIFTH CAUSE OF ACTION

### VIOLATION OF UTAH SALES REPRESENTATIVE COMMISSION PAYMENT ACT UTAH CODE § 34-44-101, et seq.

#### (All Defendants)

126.     Plaintiffs incorporate the preceding paragraphs by reference.

127.     Plaintiffs and Claimants are sales representatives who solicit orders for Alder's products and/or services and are compensated in whole or in part by commission.

128.     Alder, Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are each principals within the meaning of Utah Code Ann. § 34-44-102.

129.     The parties' written and oral agreements obligated Defendants to pay Residuals and certain other commissions to Plaintiffs and Claimants, which Defendants failed to pay.

130.     Plaintiffs and Claimants have been harmed by Defendants' failure to make these payments and are entitled to damages in the form of the three times the unpaid amounts, plus interest. Plaintiffs and Claimants are also entitled to attorney fees and costs pursuant to Utah Code Section 34-44-301.

## SIXTH CAUSE OF ACTION

### (FLSA RETALIATION, 29 U.S.C. § 215(a)(3))

#### (All Defendants)

131.     Plaintiffs incorporate the preceding paragraphs by reference.

28

132.    Plaintiffs and Claimants made numerous oral and written complaints and inquiries to Defendants regarding Alder's failure to pay compensation owed to them.

133.    As set forth in paragraph 73, Defendants retaliated against those who complained, including by decreasing or cutting off their monthly payments, terminating their employment, and filing COJs against them.

134.    As a result of Defendants' unlawful retaliation, Plaintiffs and Claimants have been harmed and are entitled to back pay, front pay, liquidated damages (equal to the amount of lost wages), and attorney fees.

## SEVENTH CAUSE OF ACTION

### (COMMON LAW FRAUDULENT INDUCEMENT)

135.    Plaintiffs incorporate the preceding paragraphs by reference.

136.    Defendants made numerous misrepresentations regarding the Notes and the COJs for the purpose of inducing Plaintiffs and Claimants to sign them. These misrepresentations included:

    a.   That the Promissory Notes and COJs were standard employee onboarding forms. See paragraph 33.

    b.   That compensation reported to the IRS on 1099 forms was income to Plaintiffs and Claimants that was fully earned and not subject to repayment. See Paragraphs 44-45.

    c.   That the sales representatives' own "books of business" were worth extremely large amounts. See paragraph 30.

    d.   That sales representatives from prior sales seasons were earning amounts far in excess of their actual income. See paragraphs 26-28.

137.    These misrepresentations were material to Plaintiffs' and Claimants' decision to work for Alder and execute the Notes and COJs, and Plaintiffs and Claimants relied on these misrepresentations in executing the Notes and COJs.

138.    Plaintiffs and Claimants seek rescission of the Notes and COJs, as well as attorney fees and costs.

139.    Plaintiffs and Claimants are also entitled to punitive damages because Defendants engaged in these fraudulent actions in an intentional, willful, and malicious manner, and in knowing and reckless disregard of the rights of Plaintiffs and Claimants.

## EIGHTH CAUSE OF ACTION

### (COMMON LAW FRAUD)

### (All Defendants)

140.    Plaintiffs incorporate the preceding paragraphs by reference.

141.    Defendants made numerous misrepresentations for the purpose of inducing Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services. These misrepresentations included:

    a.   That Alder's Residual compensation plan was designed to enable Plaintiffs and Claimants to build long-term wealth. See paragraphs 65-67.

    b.   That the sales representatives' own "books of business" were worth large amounts, up to millions of dollars. See paragraph 30.

    c.   That sales representatives from prior sales seasons were earning amounts far in excess of their actual income. See paragraphs 26-28.

{01518521-11 }

    d.   That compensation reported to the IRS on 1099 forms was income to Plaintiffs and Claimants that was fully earned and not subject to repayment. See Paragraphs 44-45.

    e.   That by deferring upfront compensation under Alder's Residual compensation plan, Plaintiffs and Claimants would earn more money overall. See Paragraphs 65-67.

142.    Defendants also made material omissions in their communications with Plaintiffs and Claimants, including:

    a.   That all monthly and other payments made to Plaintiffs and Claimants were subject to claw back under the Notes and COJs. See paragraph 43.

    b.   That all "books of business" and Residuals were subject to forfeiture upon Plaintiffs' and Claimants' termination of their relationship with Alder. See paragraphs 60-64.

    c.   That all estimates of the value of Plaintiffs and Claimants' "books of business" were based on a hypothetical valuation if Alder were to find a buyer of its accounts and that the buyer paid a competitive multiple for each account. See paragraph 30.

143.    Defendants intended for Plaintiffs and Claimants to rely on these misrepresentations and omissions in deciding to work for Alder, in agreeing to Residual-based compensation plans, and in executing the Notes and COJs.

{01518521-11 }

144.    These misrepresentations were material to and were relied on by Plaintiffs and Claimants with respect to their decisions to work for Alder, to agree to Residual-based compensation plans, and to execute the Notes and COJs.

145.    In many cases, the amount stated in the Promissory Notes and COJs did not correspond to any compensation, loan, advance or other cash amount provided to Plaintiffs and Claimants by Defendants.

146.    To the extent the amount stated in the Notes or COJs did correspond to actual payments by Defendants, the amount had been reported as income on 1099 forms, triggering Plaintiffs' and Claimants' obligation to pay income taxes on the amount. Defendants later filed COJs to recover these amounts, claiming they were loans or advances.

147.    The divisional managers – particularly those who deferred their compensation – realized too late that they were not building long-term wealth because their Residuals were forfeited as soon as they left Alder.

148.    Plaintiffs and Claimants have been harmed by Defendants' fraudulent acts and are entitled to actual damages, including but not limited to:

a.    The amount of the income taxes that Plaintiffs and Claimants paid on supposed income reported on 1099 forms that Defendants subsequently collected or attempted to collect as loans;

b.    The attorney fees and costs expended in opposing the COJs (in other actions);

c.    The Residuals ("book of business") that Plaintiffs and Claimants were promised as part of Alder's fraudulent scheme but purportedly forfeited by resigning or being terminated by Alder; and

32

d.  Disgorgement of Alder's profits resulting from its fraudulent scheme to induce Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services.

149.  Plaintiffs and Claimants are also entitled to punitive damages because Defendants engaged in these fraudulent actions in an intentional, willful, and malicious manner, and in knowing and reckless disregard of the rights of Plaintiffs and Claimants.

150.  Plaintiffs and Claimants are also entitled to attorney fees and costs.

## NINTH CAUSE OF ACTION

**(SECURITIES FRAUD, Utah Code § 61-1-1, et seq. and Section 10(b) of The Exchange Act and Rule 10b-5)**

**(All Defendants)**

151.  Plaintiffs incorporate the preceding paragraphs by reference.

152.  The Residual equity ownership in revenue streams from customer accounts are "securities" under Utah and federal law. The LLC equity interests offered in the Alder Equity Plan are also "securities" under Utah and federal law. These interests are referred to collectively as the "Securities."

153.  In connection with the offer and sale of these Securities to Plaintiffs and Claimants, Defendants directly and indirectly:

a.  employed a device, scheme, or artifice to defraud;

b.  made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

{01518521-11 }

    c.    engaged in acts, practices and courses of business which operated as a fraud or deceit upon Plaintiffs.

154.    As set forth in more detail in paragraphs 23-31 and 53-82 of this Complaint, Defendants engaged in a fraudulent scheme and made misrepresentations, omissions and/or misleading statements to Plaintiffs in connection with Defendants' offer and/or transfer to Plaintiffs of the Securities.

155.    At the time of these above-described misrepresentations, Plaintiffs and Claimants were ignorant of their falsity, and reasonably believed them to be true.

156.    The omitted and/or misrepresented information was material in that it greatly impacted Plaintiffs' and Claimants' decision to enter into Residual-based compensation agreements with Defendants.

157.    Defendants had an affirmative duty to fully and accurately disclose the omitted facts to Plaintiffs because and to the extent:  (a) Defendants Adam Schanz, Adam Christian, Kyle DeMordaunt, Dane McCartney, and/or one or more Doe Defendants were corporate officers and/or other "insiders" in Alder with access to and possession of this information; (b) the omitted facts were obviously material to Plaintiffs' and Claimants' and/or any reasonable person's decision in selecting a compensation plan; (c) Defendants had fiduciary and/or contractual relationships and duties to Plaintiffs arising from Plaintiffs' status as employees/agents and equity holders in Alder accounts; (d)  such disclosure is necessary to correct Defendants' inaccurate, incomplete and/or misleading prior disclosures to Plaintiffs and Claimants regarding the residual compensation plans; and/or (e) and/or other factors to be determined at trial.

{01518521-11 }

158.     Defendants made the above-described materially false and misleading representations and omissions for the purpose of furthering their fraudulent scheme and/or to induce Plaintiffs to enter into Residual-based compensation agreements.

159.     Defendants' misrepresentations, misleading statements and omissions of material fact were made with scienter in that they were willfully, intentionally, knowingly and/or recklessly false when made.

160.     By virtue of the foregoing, Defendants willfully, intentionally, knowingly and/or recklessly violated the Utah Uniform Securities Act, Utah Code Ann. § 61-1-1, as well as Section 10(b) of The Exchange Act and Rule 10b-5.

161.     Defendants also failed to register the Securities, in violation of Utah and federal law.

162.     Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and M. McCartney, and, upon information and belief, one or more Doe Defendants are jointly and severally liable with Alder as control persons of Alder.

163.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered compensatory damages, consequential damages, special damages, and/or recessionary damages, as are recoverable at law or equity, in an amount to be proven at trial, but including the value of the consideration provided in exchange for the security, together with interest, attorney fees and/or costs as provided by law.

164.     By virtue of the intentional and willful nature of Defendants' conduct, which conduct was intentional, willful, malicious, and in reckless disregard of Plaintiffs' rights,

Plaintiffs are entitled to treble damages and punitive damages, together with 12% interest, attorney fees, and costs.

### TENTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)

### (All Defendants)

165.    Plaintiffs incorporate the preceding paragraphs by reference.

166.    To the extent the parties' relationship is not covered by valid and enforceable contracts, Plaintiffs assert this claim of unjust enrichment.

167.    Plaintiffs and Claimants have performed valuable services for Alder for which they reasonably expected to be compensated fairly but have not been compensated fairly.

168.    Alder has knowingly and willingly accepted and benefited from Plaintiffs' and Claimants' services.

169.    It would be inequitable and unjust for Alder to retain the benefits of Plaintiffs' and Claimants' services without providing fair compensation to them.

170.    Plaintiffs and Claimants are entitled to fair compensation for their services, in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION

### (DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 AND 2202)

### (Alder)

171.    Plaintiffs incorporate the preceding paragraphs by reference.

172.    Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction," this Court is empowered to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

36

173.    There is an actual controversy between the parties as to whether the Notes are valid and enforceable and whether the Residual-based compensation agreements are enforceable by Defendants.

174.    Based on the facts alleged above, specifically in Paragraphs 23-52, Plaintiffs seek a declaration that the Notes are not valid or enforceable, pursuant to theories of fraud in the inducement, fraud in factum, unconscionability, unclean hands, and estoppel.

175.    In addition, the Residual-based compensation agreements are unenforceable by Defendants pursuant to Utah Code § 61-1-22 because Defendants made these contracts in violation of Utah securities laws.

176.    Plaintiffs reserve the right to seek further necessary and proper relief based on the Court's entry of declaratory judgment, pursuant to 28 U.S.C. § 2202.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Class, pray for judgment and the following specific relief against Defendants as follows:

1.    That the Court declare, adjudge and decree that this action is a proper collective action and class action and certify the proposed Class and/or any other appropriate subclasses under FRCP Rule 23 and 29 U.S.C. § 216;

2.    That, at the earliest possible time, Plaintiffs be allowed to give notice of this action, or that the Court issue such notice, to all members of the proposed Class, with such notice informing them that this civil action has been filed, the nature of the action, and of their right to participate in this lawsuit;

3.      That this Court designate the named Plaintiffs as Class Representatives and their lawyers as Class Counsel;

4.      That the Court enter a Judgment and Decree declaring that Defendants willfully violated their legal duties under the FLSA as to the Plaintiffs and the members of the proposed FLSA Class;

5.      With regard to the FLSA claims, and as to the Plaintiffs and the members of the proposed FLSA Class, that the Court award unpaid regular and overtime compensation, together with an additional amount as liquidated damages, pre- and post-judgment interest, attorney fees, and costs;

6.      With regard to the UPWA violations, and as to the Plaintiffs and the members of the proposed Class, that the Court award the full amount of unpaid regular wages, as well as statutory damages, pre- and post-judgment interest, attorney fees, and costs;

7.      With regard to the contract claims, that the Court award commissions, Residuals, and all other amounts owing to them under their employment agreements, plus pre- and post-judgment interest attorney fees, and costs;

8.      With regard to the Utah Sales Representative Commission Payment Act claim, that the Court award three times the amount of unpaid Residuals and other commissions, plus interest, attorney fees, and costs;

9.      With regard to the FLSA retaliation claim, that the Court award back pay, front pay, liquidated damages (equal to the amount of lost wages), and attorney fees;

10.      With regard to the fraudulent inducement claim, that the Court order rescission of the Notes and COJs;

11.     With regard to the fraud claim, that the Court award actual damages in at least the following amounts, plus punitive damages and attorney fees and costs:

      a.   The amount of the income taxes that Plaintiffs and Claimants paid on supposed income reported on 1099 forms that Defendants subsequently collected or attempted to collect as loans;

      b.   The attorney fees and costs expended in opposing the COJs (in other actions);

      c.   The Residuals ("book of business") that Plaintiffs and Claimants were promised as part of Alder's fraudulent scheme but purportedly forfeited by resigning or being terminated by Alder; and

      d.   Disgorgement of Alder's profits resulting from its fraudulent scheme to induce Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services.

12.     With regard to the securities fraud claim, that the Court award treble damages and punitive damages, together with 12% interest, attorney fees, and costs;

13.     With regard to the unjust enrichment claim, that the Court award just compensation for the services provided to Alder by Plaintiffs and Claimants;

14.     With regard to the declaratory judgment claim, that the Court declare that the Notes are not valid or enforceable and that the Residual-based compensation agreements are unenforceable by Defendants; and

15.     That the Court order such further relief as the Court deems just and equitable, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices.

{01518521-11 }

## **JURY DEMAND**

Plaintiffs and Claimants hereby demand trial by jury on all issues triable of right by jury.

DATED:  July 22, 2019.

Respectfully Submitted,

CLYDE SNOW & SESSIONS

/s/Matthew A. Steward
Matthew A. Steward
Shaunda L. McNeill
Victoria B. Finlinson
*Attorneys for Plaintiffs*

40