Matthew A. Steward (#7637)
Shaunda L. McNeill (#14468)
Victoria B. Finlinson (#15103)
Keith M. Woodwell (#7353)
CLYDE SNOW & SESSIONS
One Utah Center, Suite 2200
201 South Main Street
Salt Lake City, Utah 84111
mas@clydesnow.com
slm@clydesnow.com
vbf@clydesnow.com
kmw@clydesnow.com
Telephone: (801) 322-2516
Fax No.: (801) 521-6280

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| SHADRACH ENNIS, NICOLAAS VANLEEUWEN, and TERRANCE JESCLARD, individually and on behalf of all others similarly situated, | Case No.  2:19-cv-00512-CW-DBP |
| | **THIRD AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| | District Judge Clark Waddoups |
| ALDER PROTECTION HOLDINGS, LLC, a Delaware limited liability company; ALDER HOLDINGS, LLC, a Utah limited liability company; ADAM SCHANZ, an individual; ADAM CHRISTIAN, an individual; KYLE DEMORDAUNT, an individual; DANE MCCARTNEY, an individual; COVE SMART, LLC, a Delaware limited liability company, | Magistrate Judge Dustin Pead |
| Defendants. | |

## SUMMARY

Shadrach Ennis, Nicolaas Vanleeuwen, and Terrance Jesclard (collectively "Plaintiffs") individually and on behalf of all other similarly situated individuals ("Claimants"), bring this action against Alder Protection Holdings, LLC and Alder Holdings, LLC (collectively, "Alder" or the "Company"); Adam Schanz; Adam Christian; Kyle DeMordaunt; and Dane McCartney. (Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are collectively referred to as the "Individual Defendants." Alder and the Individual Defendants are collectively referred to as "Defendants.")  This action is brought as a nationwide collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and as a class action under Fed. R. Civ. P. 23(b)(3) for violations of Utah's Payment of Wages Act, Utah Code § 34-28-1 *et seq.*; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; violation of the Utah Sales Representative Commission Payment Act, Utah Code § 34-44-101, *et seq.*; Retaliation under the FLSA, 29 U.S.C. 215(a)(3); Common Law Fraudulent Inducement; Common Law Fraud; Securities Fraud, Utah Code § 61-1-1, *et seq.*, Section 10(b) of the Securities and Exchange Act, and Rule 10(b); Unjust Enrichment; and Declaratory Judgment.

## JURISDICTION & VENUE

1.      This Court has federal question jurisdiction under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiffs' and Claimants' state law claims under 28 U.S.C. § 1367 because they arise from the same case or controversy as the FLSA claims.

2.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District and Division.

{01907797-1 }

3.      Defendants are subject to personal jurisdiction in Utah.

## THE PARTIES

4.      Shadrach Ennis is an individual currently residing in Salt Lake City, Utah.
Mr. Ennis worked for Alder from approximately January of 2016 to February of 2019.  He
served as a Junior Divisional Sales Manager from approximately 2017 to 2018.

5.      Nicolaas Vanleeuwen is an individual currently residing in Mobile, Alabama.
Mr. Vanleeuwen worked for Alder from approximately March of 2016 to January of 2019.  He
served as a Divisional Sales Manager from approximately 2017 to January of 2019.

6.      Terrance Jesclard is an individual currently residing in Utah.  Mr. Jesclard worked
for Alder from approximately 2011 to 2018.  He served as a Divisional Sales Manager from
approximately 2011 to 2018.

7.      Defendant Alder Protection Holdings, LLC is a Delaware limited liability
company with its principal place of business in Orem, Utah.  Defendant Alder Holdings, LLC is
a Utah limited liability company with its principal place of business in Orem, Utah. On
information and belief, these two limited liability companies, along with other affiliates, are part
of a single enterprise and are not operated or managed as distinct businesses. Alder represents
that it has business locations in all 50 states in the United States.

8.      Alder is engaged in the business of selling, installing, and servicing electronic
security equipment.

9.      Adam Schanz is an individual believed to reside in Utah County, Utah.  Mr.
Schanz is the founder, owner, manager, and the Chief Executive Officer of the Company.  At all
relevant times Mr. Schanz was an "employer" as defined under the FLSA and the Utah Payment

{01907797-1 }

of Wages Act. Mr. Schanz was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them. Mr. Schanz exercised control over hiring and firing and over the setting, payment, reduction, and non-payment of compensation, wages, commissions, benefits. He also exercised control over the management decisions affecting the workforce.

10.     Adam Christian is an individual believed to reside in Utah County, Utah. Mr. Christian is the General Counsel of Alder. At all relevant times Mr. Christian was an "employer" as defined under the FLSA and the Utah Payment of Wages Act. Mr. Christian was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them. Mr. Christian exercised control over hiring and firing and over the setting, payment, reduction, and non-payment of compensation, wages, commissions, benefits. He also exercised control over the management decisions affecting the workforce.

11.     Kyle DeMordaunt is an individual believed to reside in Utah County, Utah. Mr. DeMordaunt is the CFO of Alder. Among other things, Mr. DeMordaunt is responsible for the administrative, financial, and risk management operations of Alder, including the monitoring and preserving of company assets and financial results. At all relevant times Mr. DeMordaunt was an "employer" as defined under the FLSA and the Utah Payment of Wages Act. Mr. DeMordaunt was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them. Mr. DeMordaunt exercised control over hiring and firing and over the setting, payment, reduction, and non-payment of compensation, wages, commissions, and benefits. He also exercised control over the management decisions affecting the workforce.

12.     Dane McCartney is an individual believed to reside in Utah County, Utah.  Mr. McCartney is the President of Sales for Alder.  Among other things, Mr. McCartney is responsible for overseeing and managing the individuals that comprise Alder's sales force and their compensation, including the making and repayment of loans and advances.  At all relevant times Mr. McCartney was an "employer" as defined under the FLSA and the Utah Payment of Wages Act.  Mr. McCartney was actively involved in and exercised the authority to not pay Alder sales representatives the compensation owed to them.  Mr. McCartney exercised control over hiring and firing and over the setting, payment, reduction, and non-payment of compensation, wages, commissions, and benefits.  He also exercised control over the management decisions affecting the workforce.

13.     Cove Smart, LLC ("Cove"), is a Delaware limited liability company with its headquarters in Utah, at the same location as Alder's headquarters.  On information and belief, the majority of its membership interests are held by Mr. Schanz.

## NATURE OF THE ACTION

14.     Alder is a door-to-door sales company that relies on individual sales representatives to sell its alarm services and products on a commission basis to residential customers throughout the United States.

15.     Alder recruits sales representative through false representations and then exploits them into working for little or no compensation.

16.     Alder incentivizes sales representatives to forego immediate compensation in exchange for illusory promises of long-term wealth through the creation of "books of business" that will pay guaranteed returns to them in the future.

{01907797-1 }

17.     Alder gives sales representatives a false understanding that they have ownership over their "books of business."

18.     In addition, Alder misrepresents commissions paid to sales representatives as loans and forces sales representatives to sign Promissory Notes ("Notes") and Confessions of Judgment ("COJs") for these fictional loans in arbitrary amounts.

19.     Alder then uses the Notes and COJs to retaliate against sales representatives who leave the Company and coerce sales representatives into continuing to work for Alder as essentially indentured servants.  On information and belief, Defendants also use the Notes to collateralize loans for Alder, Cove, and other entities.

20.     These exploitative practices are all part of Defendants' fraudulent scheme to profit from the sales representatives' talent and hard work without compensating them as required by applicable law and the parties' contracts.

21.     Mr. Schanz has also created separate entities through which Defendants have been unjustly enriched by the transfer of value from Alder to these entities, to the detriment of the sales representatives.

22.     This action is brought to recover damages for the Defendants' wrongful conduct, and to redress and end Alder's long-time pattern of willful and unlawful conduct.

23.     With regard to claims under the FLSA, Plaintiffs bring this action on behalf of themselves, and as a collective action on behalf of all other similarly situated sales representatives who are currently or were previously employed by Alder within the United States.  Alder has failed to pay sales representatives minimum wage and overtime, including but not limited to during training time.

{01907797-1 }

24.     With regard to all other causes of action, Plaintiffs bring this action on behalf of themselves and as a class action on behalf of all other similarly situated sales representatives who currently or previously worked for Alder within the United States.

## COMMON FACTUAL ALLEGATIONS FOR ALL CLAIMS

**1. Alder Recruits Sales Representatives To Work Under a Residual Compensation Model Based on Misrepresentations**

25.     Alder uses door-to-door sales representatives to sell its products and services throughout the United States.

26.     The individuals who Alder recruits as door-to door sales representatives are predominantly college-age males who are recruited to work as independent contractors for Alder during the summer months.

27.     Alder trains these college-age sales representatives in Alder's sales practices and techniques and assigns them to locations throughout the United States to sell Alder's products and services on a commission basis.  At the sales representatives' election, the commissions may be in the form of deferred/equity compensation, known as "Residuals."

28.     Alder recruits sales representatives by, among other things, making representations regarding alleged achievements and income of certain individual sales representatives from prior sales seasons.  A sample recruiting brochure is attached hereto as Exhibit A.  Alder's published "2018 Sales Statistics" are attached hereto as Exhibit B.  This sample recruiting brochure is substantially similar to the brochures received by Plaintiffs when they were recruited and received by Claimants when they were recruited.

29.     The information contained in Exhibit A, Exhibit B, and other similar recruiting messages is false and misleading in multiple respects, including the following:

7

a.  Alder has a policy and practice of dramatically overstating the income earned by the individuals highlighted in Exhibit A, Exhibit B, and elsewhere in recruiting materials.

b.  Alder has a policy and practice of representing to recruits and sales representatives that a "book of business" is a fully vested form of compensation that creates a form of "passive income."  For example, Exhibit A states that "accounts you sell continue to generate value for you throughout their life."

30.     Alder representatives, including the Individual Defendants, also made misrepresentations during in-person recruiting conversations, on which Plaintiffs and Claimants relied in deciding to work for Alder and to continue working for Alder.  These misrepresentations included false statements about how sales representatives would build a "book of business" that would result in a passive income stream and would be bought out by a third party at a 50x multiple or similarly high multiple.

31.     For example, in or around March of 2016, Adam Schanz personally recruited Mr. Vanleeuwen by representing (1) that Mr. Vanleeuwen would earn $50,000 per month after his second summer sales season and (2) that as an example of Mr. Vanleeuwen's earning potential, a certain rising-star sales representative for Alder was earning $150,000 per month (even though this individual was actually earning $20,000 per month).

32.     When personally recruiting Mr. Jesclard (in 2011) and former Plaintiff Shawn Harding (in 2013) to work for Alder, Adam Schanz represented that the Residual model and building a "book of business" would mean passive income for Mr. Jesclard and Mr. Harding. Schanz explained that Mr. Jesclard and Mr. Harding would only need to work as salesmen for a

{01907797-1 }

few years to build up their book of business and then would continue to earn money on those accounts while pursuing other careers or interests.

33.     Mr. Schanz represented to Mr. Jesclard in 2011 that (1)  Alder sales representatives could buy homes with cash as a result of their large salaries at Alder; (2) Mr. Jesclard would be an equal partner with Alder and would retain 50% equity in all accounts he either generated or purchased; (3) Mr. Jesclard could choose how much of his Residual he would receive as a salary while the remaining Residual amounts would pay off any debt on his "book of business"; and (4) Alder would sell its accounts in a few years and Mr. Jesclard would be paid 50% of the value of his accounts multiplied by a minimum multiple of 40x.

34.     Adam Schanz specifically represented to Mr. Harding in 2013 that (1) for each account he sold, Mr. Harding would receive $20 and (2) Alder would sell the accounts in three to five years for no less than a 55x multiple on each account.  Schanz explained that Mr. Harding would be able to use a portion of his residuals to pay debt and then could choose how much of his residuals to be paid per month as a salary.

35.     As another example, Connor Rockwood, Alder's Vice President of Recruiting, stated to Mr. Ennis during an in-person recruiting conversation in 2016 (1) that one or more Alder sales representatives were earning $150,000 per month; (2) that if Mr. Ennis's employment with Alder were terminated, he would continue to receive residual payments for the same number of years that he had worked for Alder; and (3) that Mr. Ennis would own 40% equity in all accounts he sold, providing the following example: if Mr. Ennis sold 200 accounts, he would make a total of $440,000, half of which would be Residual payments made to Mr. Ennis and the other half would be equity that would apply to his "book of business."

9

36.     During Plaintiffs' and Claimants' employment, Individual Defendants made repeated false statements to them about the amount of their respective "books of business."  For example:

    a.  On or about December 12, 2018, Mr. Vanleeuwen sent a text message to Mr. Schanz inquiring about his "book of business."  Mr. Schanz responded that Mr. Vanleeuwen was accruing $47,000 per month in total residuals.  Mr. Schanz also represented that Mr. Vanleeuwen's "book of business" was worth over $3 million.

    b.  Subsequently, in a declaration dated February 22, 2019, Mr. Schanz admitted that any representations regarding Mr. Vanleeuwen's "book of business" were literally false because "it would have only been for argument purposes and any actual amounts would be offset by expenses incurred by Alder in connection with each account and each sales representative on Vanleeuwen's team."  He further admitted "any such valuation was based on a hypothetical valuation if Alder were to find a buyer of its accounts . . . and that buyer paid a competitive multiple for each account."

    c.  The information that Mr. Schanz admittedly omitted from his communications with Mr. Vanleeuwen—that the cited amounts did not include expense offsets and were based on a hypothetical valuation in a hypothetical transaction—was highly material to the calculations themselves and to Mr. Vanleeuwen's decision to remain with Alder under the Residual compensation plan.

{01907797-1 }

d.   At various points in Mr. Jesclard's employment, Mr. McCartney and/or Mr. Kauffmann told him that the value of his book of business was growing at a rate of between $20,000 and $35,000 per month and was worth a few million dollars total.  Mr. Jesclard chose to continue working for Alder based on these representations.

e.   After a few years of negative experiences with Alder, Mr. Harding resigned his employment with Alder.  To recruit him to come back to Alder, Adam Schanz represented to him that his book of business was worth around $1.1 million.  Mr. Harding relied on this statement in returning to work for Alder.

f.   Connor Rockwood and Brandon Rockwood represented to Mr. Ennis on multiple occasions that his book of business was "positive," meaning that he was free of any debt to Alder.  Relying on this statement, Mr. Ennis elected to receive a higher monthly payment of Residuals from the accounts he generated.

37.   Jason Summers, Alder's former Chief of Sales Operations, was responsible to oversee Alder's sales reporting and the calculation of residuals in each sales representative's "books of business."  Mr. Summers has personal knowledge of Alder and the Individual Defendants intentionally providing false and/or misleading information to and intentionally withholding information from sales representatives regarding the true value of their residuals, for the purpose of inducing them to continue providing services to Alder.  Mr. Summers has provided a declaration attached as Exhibit D.

38.   As Alder's Chief of Sales Operations, Mr. Summers provided Invested Capital Reports to sales representatives upon request.  These reports would show a sales representative's

{01907797-1 }

Residual balance (although the reports were difficult to understand and often unreliable because the information was out of date and/or the wrong Sales Rules were applied).  During 2018, Mr. Schanz instructed Mr. Summers on several occasions to stop providing Invested Capital Reports. At first, Mr. Summers ignored the instruction and continued providing the reports to sales representatives upon request.  However, at the end of the 2018 summer sales season, Mr. Schanz confronted Mr. Summers in Mr. Summers' office and forcefully ordered him to stop printing the reports because they led sales representatives to ask too many questions about why their Residual balance was so low, and Mr. Schanz did not have time to answer all these questions.

39.     In or around July 2020, Mr. Summers observed Mr. McCartney provide false information to sales representative AJ Kilgore in a text message regarding the value of his "book of business."  Specifically, Mr. McCartney used a formula consisting of the product of some arbitrary monthly revenue amount and a 50x acquisition multiple less a debt amount.  Mr. McCartney's representation gave Mr. Kilgore a false and inflated view of the "equity" associated with his "book of business."  Mr. McCartney provided his assurance of "equity" to convince the sales representative to keep selling for Alder.  Mr. McCartney did so after Mr. Summers had specifically told him that the sales information should be used only for sales statistics and not to communicate to sales representatives the value of their Residuals because it did not reflect deductions, expenses, cash advances, or adjustments.

40.     Plaintiffs and Claimants relied on these false and misleading statements in deciding to work for Alder, in deciding to remain with Alder, and in electing the Residual compensation plan.

**2. Alder Uses Promissory Notes and Confessions of Judgment to Control, Intimidate, and Retaliate Against Its Sales Representatives**

41.     Alder required Plaintiffs and Claimants to sign Notes and COJs in arbitrary amounts at the time they were hired by Alder and/or at various intervals throughout their relationship with Alder.

42.     Alder initially presented the Notes and COJs as standard onboarding and annual paperwork.  However, if an employee did not immediately sign or requested an explanation, company representatives would become more insistent that the documents be signed and would make threats.

43.     For example, while working for Alder in Alabama, Mr. Harding returned from door-to-door sales with his team to the office to find his Regional Manager, Bobby Shane, with printed Notes and COJs for everyone on the team and a notary.  Each COJ had an arbitrary number written as the judgment amount and everyone was told they had to sign the documents before they went home for the day or else their pay would be shut off.

44.     If present at Alder headquarters in Utah during a push for representatives to sign COJs, representatives would be asked to report to an Alder administrator who would present the COJ and Note on an iPad and instruct the representatives to sign.  The administrator would then churn through the line of representatives waiting to sign their designated Note and COJ under the threat of withheld compensation.

45.     Dane McCartney and/or Adam Christian would personally call the employees and demand that they sign the baseless Notes and COJs or else their monthly payments would be cut off and their company cell phone (their primary vehicle for conducting business) would be shut down.

46.     Each time Mr. Vanleeuwen was required by Alder to sign a Note and COJ, he received a call from Mr. McCartney threatening that if he did not sign that very day, his compensation would be cut off.  To the best of Mr. Vanleeuwen's knowledge and recollection, these calls occurred on or about March 23, 2016, December 14, 2016, September 21, 2017, and September 10, 2018.

47.     Alder drafted the Notes and COJs with no opportunity for Plaintiffs or Claimants to negotiate them and with scarcely any time to read them.

48.     Alder never explained to Plaintiffs that Alder could use the documents to obtain a monetary judgment against them without giving them an opportunity to assert defenses to the alleged default or to dispute the amounts sought in the judgment.

49.     Alder did not advise Plaintiffs to have an attorney review or negotiate the terms of the Notes or COJs.

50.     Plaintiffs did not receive any benefit in exchange for signing the Notes and COJs. The Notes and COJs reflected fictional loans that were never actually made to Plaintiffs.

51.     In litigation on the Notes and COJs, Alder has represented that the Notes and COJs secured advances made to Plaintiffs.  However, in those cases, Alder was unable to show that the judgment amounts were calculated based on any particular advances.

52.     When Mr. Harding asked Mr. Kauffman how Alder determines the monetary amount for each COJ, Mr. Kauffman responded that Mr. Schanz simply chooses a number he thinks is fair.  Mr. Summers has also confirmed that the amounts stated on the Notes and COJs are arbitrary.

53.     In many cases, the Notes and COJs were sloppily prepared and contained errors.

{01907797-1 }

54.     In some cases, the payment date was the same date on which the loan date identified in the Note. Kyle DeMordaunt stated in a declaration dated February 22, 2019, that "Alder intentionally made the payment date" on Mr. Vanleeuwen's September 21, 2017 Note to be September 21, 2017—the same date the Note was signed and the same date the loan was purportedly made.  Mr. DeMordaunt admitted that the purpose of the Note was hold Mr. Vanleeuwen hostage.  He explained in his declaration that "Vanleeuwen signed the Note and COJ in September, which is after the main sales season for Vanleeuwen and his sales team and is often the time, in Alder's experience, that its independent contractor sales representatives will terminate their relationship with Alder and switch to a competitor of Alder's.  Therefore, Alder wanted the ability to immediately enforce the Note in the event that Vanleeuwen left Alder."

55.     Most of the Plaintiffs were forced to sign Notes and COJs for amounts that exceeded the total compensation provided to them by Alder during the term of their relationship. For example, Mr. Vanleeuwen signed Notes and COJs for a combined amount of at least $717,000—more than the total amount of $616,130.02 that he received from Alder while providing services to the Company.

56.     The amounts paid to Plaintiffs were reported to the IRS on 1099 forms, triggering Plaintiffs' duty to pay income taxes on such amounts.  Plaintiffs relied on Defendants' representations on the 1099 forms by paying income taxes on reported amounts.

57.     The preparation and submission of these 1099 forms was inconsistent with Alder's position that the funds reported on the 1099 forms were loans or advances subject to repayment.

15

58.     Alder used the Notes and COJs to intimidate Plaintiffs and to prevent them from leaving the Company, thus creating a form of debt bondage.

59.     Alder also used the Notes and COJs to retaliate against Plaintiffs for leaving the Company and to intimidate other sales representatives who may be considering leaving the Company.

60.     Each of the Plaintiffs has been harmed as a result of Alder filing a COJ against them, which resulted in a judgment being entered before they were able to object or otherwise respond to the COJ.  Plaintiffs have been forced to retain counsel in order to attempt to set aside the judgments.

61.     For example, a $53,000 judgment was entered against Mr. Vanleeuwen as a result of the Note and COJ that he was forced to sign on September 21, 2017.  Following extensive briefing and submission of evidence by both parties and oral argument, the Third District Court set aside the judgment against Mr. Vanleeuwen, finding among other things that Alder had made misrepresentations to the Court regarding the amount owed by Mr. Vanleeuwen and that the COJ and underlying Note were likely unconscionable and otherwise unenforceable.

62.     Similarly, a $16,000 judgment was entered against Mr. Ennis as a result of the $16,000 Note and COJ that he was forced to sign on November 10, 2017.  Following extensive briefing and submission of evidence by both parties and oral argument, the Third District Court set aside the judgment against Mr. Ennis.

63.     A $36,000 judgment was entered against Mr. Jesclard as a result of the $36,000 Note and COJ that he was forced to sign on October 29, 2014.  Following extensive briefing and

submission of evidence by both parties and oral argument, the Third District Court set aside the judgment against Mr. Jesclard.

64.     A $47,000 judgment was entered against former Plaintiff Mr. Harding as a result of the $47,000 Note and COJ that he was forced to sign on October 25, 2016.  The Third District Court denied Mr. Harding's motion to set aside the judgment. That decision was appealed; however, the case was settled before the appeal was decided.  As a result of the settlement, Mr. Harding withdrew as a Plaintiff in this action.

65.     In each of these cases, Alder sought to justify its judgment by making representations to the Court as to the total amount of money Plaintiffs owed at the end of their employment with Alder:

> a.   Alder represented that Mr. Vanleeuwen owed the company $553,153.31 (although it later partially retracted that calculation).
>
> b.   Alder represented that Mr. Ennis owed the company $31,120.96.
>
> c.   Alder represented that Mr. Jesclard owed the company $201,790.25.
>
> d.   Alder represented that Mr. Harding owed the company $304,166.25.

66.     Based on Alder's representations, each of these high-performing sales representatives went deeper into debt the longer they worked for Alder, demonstrating that Alder's so-called Residual "compensation system" is actually modern-day debt bondage.

67.     Alder's characterizations of Plaintiffs' and Claimants' earnings as advances, Alder's practice charging expenses and other amounts to Plaintiffs and Claimants (described in more detail below), and Alder's practice of clawing back Plaintiffs' and Claimants' earnings

through Notes and COJs resulted in their earnings falling below minimum wage and below

salary basis requirements for exempt employees.

68.     Defendants also used the Notes to collateralize loans for other entities owned by

Mr. Schanz, as described below.

### 3.   Alder Misclassifies its Sales Representatives as Independent Contractors

69.     Alder's employment and compensation agreements with Plaintiffs and Claimants

state that they are independent contractors.[1]

70.     However, Alder exercises a high degree of control over its sales representatives,

which is inconsistent with independent contractor status.  For example:

  a.  Plaintiffs were required to train and manage Alder representatives who sold

      Alder's products and services to customers.

  b.  Plaintiffs were required to work, and did work, far in excess of 40 hours per week,

      particularly during the summer sales season.

  c.  Plaintiffs were required to comply with Alder's instructions and policies,

      including its Code of Conduct, its Sales Rules, its Guidebook, and its A/V

      Recording Policy.

  d.  Plaintiffs were required to attend regular meetings at the direction of Alder,

      including weekly manager meetings and conference calls.

---

[1] Alder's agreement actually purports to classify its workforce as independent contractors "[e]xcept as otherwise required by applicable governmental authority for licensing, taxation or other purposes…"  It is axiomatic that Alder cannot classify its workforce one way for one self-serving purpose and another way for another self-serving purpose.

{01907797-1 }

e.   Plaintiffs were required to request leaves of absence and receive approval from Alder before taking leave for any reason.

f.   Plaintiffs were required to perform services personally and could not contract out for their performance by others.

g.   Plaintiffs were required to provide services on behalf of and under the branding of Alder.  Alder required them to wear a uniform polo shirt and identification badge with Alder branding.

h.   Plaintiffs were required to enter noncompetition agreements, which purport to prevent them from working for an Alder competitor during and for a period of time after the end of their relationship with Alder.

**4.  Alder Requires Sales Representatives to Sign Complex Compensation Agreements that Contradict Verbal Promises and Force Employees to Choose Between Forfeiting Accrued Compensation or Remaining with the Company Indefinitely**

71.    Alder employs three levels of sales representatives: Rookie Sales Representatives, Experienced Sales Representatives, and Divisional Sales Managers.[2]

72.    Alder requires each sales representative to enter an independent contractor agreement that provides for how the sales representative will be compensated (the "Agreement(s)").  The Agreements signed by Plaintiffs and Claimants are all substantially the same.  Alder filed what it purported to be the governing Agreements between Alder and Plaintiffs. *See* Docs. 48-7, 48-8, 48-10. Alder subsequently produced a Sales Manager Agreement for Shadrach  Ennis dated November 6, 2018.

---

[2] A few individuals have been given the intermediate title of Junior Divisional Sales Manager.

73.     These Agreements were uniformly presented to Plaintiffs and Claimants under circumstances in which Plaintiffs and Claimants had no bargaining power.  Plaintiffs and Claimants were not given adequate time to review the contracts prior to signing and were pressured to sign quickly under threat of their compensation being cut off.  Plaintiffs and Claimants were not allowed to ask questions and/or were not provided adequate answers to their questions about the Agreements.  Plaintiffs and Claimants were also denied copies of their signed Agreements.  As a result, the Agreements are procedurally unconscionable.

74.     The terms of the Agreements are almost entirely one-sided in favor of Alder. For example, the 2017 Divisional Sales Manager Agreement, attached as Exhibit C, provides:

a.  Alder has unilateral authority to revise the fees it charges to a Divisional Sales Manager ("Divisional") and deducts them from earnings. [§ 1.]

b.  The Division must sign "a waiver and release of claims agreement in a form satisfactory to Alder" in order to receive "Monthly Residual due Divisional through the date of termination," "Override Residual due Divisional through the date of termination," and other amounts owed to Divisional. [§ 5(d).]

c.  Divisional is entitled to deferred compensation in the form of Residuals only "[s]o long as Divisional is actively engaged in providing the Services" to Alder. [§ 6.]

d.  "Divisional hereby absolutely, unconditionally and irrevocably guarantees. . . Advances" made to individuals recruited to work for Alder by Divisional. [§ 22(a).]

e.  "Divisional will not exercise. . . any right of subrogation, reimbursement, exoneration, contribution or indemnification" against the Recruits "unless and until all of the Obligations and all other amounts payable under this guaranty shall have been indefeasibly paid in full." [§ 22(g).]

f.  Alder (but not Divisional) is released from "consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, lost profits or revenues or diminution in value" arising under the agreement. [§ 23(a).]

{01907797-1 }

g.  Alder's (but not Divisional's) liability under the agreement is limited to "the total of the amounts paid and amounts accrued but not yet paid to Divisional pursuant to this agreement in the twelve (12) month period preceding the event giving rise to the claim." [§ 23(b).]

h.  "Divisional shall indemnify and hold harmless, and at Alder's request defend, Alder . . . from and against any and all claims" for "any breach . . .of any agreement with Alder by a Recruit" or for "bodily injury, death of any person, or damage to real or tangible, personal property resulting from Divisional's or any of his Recruits' acts or omissions." [§ 24.]

i.  Divisional waives the right to participate in a class action or collective action. [§ 25(g).]

j.  Divisional waives the right to jury trial. [§ 25(h).]

75.    The terms of the Agreements unconscionably deprive Plaintiffs and Claimants of effective means by which to enforce their rights and place an inordinate amount of liability on Plaintiffs and Claimants.  As a result, the Agreements are substantively unconscionable.

76.    Alder's compensation plans involve two primary methods of compensation: commissions on sales made and Residual equity interests in customer accounts.

77.    Most Rookie Sales Representatives and Experienced Sales Representatives are compensated under a hybrid compensation plan consisting of part commissions and part Residuals.

78.    Most Divisional Sales Managers are compensated entirely through Residuals.

79.    For example, one 2017 Divisional Sales Manager Agreement provides for three types of Residuals – Monthly Residuals, Override Residuals, and Sale Residuals – as set forth in section 6 of Exhibit C:

Monthly Residual. So long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, Alder shall pay Divisional with respect to each

21

Eligible Residual Contract[3] personally generated by Divisional monthly residual compensation (the "Monthly Residual") out of the full MMR [monthly monitoring rates] actually collected (not billed) by Alder in respect of such Eligible Residual Contract an amount equal to the then applicable RCR[4] for such Eligible Residual Contract. Alder shall pay the Monthly Residual due Divisional for MMR collected on Eligible Residual Contracts during a calendar month on or before the twenty-fifth (25th) day of the following month. Alder's payment of Monthly Residual to Divisional shall be accompanied by a monthly report computing the Monthly Residual being paid and shall detail Divisional' s Eligible Residual Contracts, the MMR actually collected thereon and the RCR payable with respect thereto.

<u>Override Residual</u>. So long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, Alder shall pay Divisional with respect to each Eligible Residual Contract personally generated by an Override Recruit a monthly residual override (the "Override Residual") out of the full MMR [monthly monitoring rates] actually collected (not billed) by Alder in respect of such Eligible Residual Contract the following applicable amount: (A) with respect to an Eligible Residual Contract generated by a First-Tier Recruit, $5.00; (B) with respect to an Eligible Residual Contract generated by a Second-Tier Recruit, $3.00; and (C) with respect to an Eligible

---

[3] Under the 2017 Divisional Sales Manager Agreement, "'Eligible Residual Contract' means, as of the time of determination, a Residual Contract satisfying all of the following requirements: (i) all installation fees and monthly service and/or monitoring fees (other than fees outstanding for less than thirty (30) days) have been received or otherwise collected in full by Alder; (ii) the customer is currently satisfied with the installation, security equipment, monitoring services and all other services provided by Alder and/or the third-party monitoring company; (iii) the Contract has been properly documented and equipment installed in accordance with the then current Alder Policies; (iv) the Contract has not been cancelled or otherwise terminated and the customer has not requested to cancel or otherwise terminate the Contract; (v) when generated or otherwise first identified as a Residual Contract, the Contract was for an initial term of not less than forty-two (42) months; and (vi) the Contract is either an Auto-Pay Contract or a Qualified Invoiced Contract. For the avoidance of doubt, the following Contracts will not be deemed Eligible Residual Contracts: (A) Contracts that are submitted to Alder more than five (5) days after they are signed by the customer; (B) Contracts where the customer has not made at least one payment of the applicable MMR from the date of the installation of the security system; (C) Contracts that have any amounts owed Alder that are more than thirty (30) days past due; or (D) Contracts that that do not qualify as Residual Contracts.

[4] Under the 2017 Divisional Sales Manager Agreement, "'RCR' means, with respect to an Eligible Residual Contract personally generated by Divisional, the residual compensation rate (stated as a dollar amount) applicable to such Eligible Residual Contract and is equal to the positive remainder (or zero if the remainder is zero or less) of (i)the applicable Maximum RCR Amount, <u>minus</u> (ii) the positive remainder (or zero if the remainder is zero or less) of (A) the Eligible Residual Contract's Suggested MMR (as set forth on the Residual Contract Table) <u>minus</u> (B) the Eligible Residual Contract's actual MMR."

Residual Contract generated by a Third-Tier Recruit, $1.00. Alder shall pay the Override Residual due Divisional for MMR collected on Eligible Residual Contracts during a calendar month on or before the twenty fifth (25th) day of the following month. Alder's payment of Override Residual to Divisional shall be accompanied by a monthly report computing the Override Residual being paid.

Sale Residual [for Existing Divisional Contracts]. Subject to Section 6(b)(iii)(C), so long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, upon the occurrence of a Contract Sale[5] of an Existing Divisional Contract,[6] Alder shall pay Divisional out of the Net Sales Proceeds from such Contract Sale an amount (the "Contingent Sale Residual") equal to the excess, if any, of (1) the Expected Sale Share,[7] over (2) the aggregate amount distributed to Divisional in respect of his Contract Participation in such Contract Sale; provided, in no event shall the Contingent Sale Residual in such Contract Sale exceed the applicable Maximum Contingent Sale Residual. Alder shall pay the Contingent Sale Residual due Divisional with respect to a Contract Sale within fifteen (15) days after receipt of the Net Sales Proceeds in such Contract Sale. Alder's payment of Contingent Sale Residual to Divisional shall be accompanied by a report computing the Contingent Sale Residual being paid and any Purchase Price Adjustments (as defined below) applicable thereto.

Sale Residual [for Eligible Residual Contracts]. Subject to Section 6(b)(iii)(C), so long as Divisional is actively engaged in providing the Services or is subject to an Approved Absence, upon the occurrence of a Contract Sale of an Eligible Residual Contract personally generated by an Override Recruit, Alder shall pay Divisional out of the Net Sales Proceeds from such Contract Sale an amount (the "Override Sale Residual") equal to the product of (1) Divisional' s Override Residual for such Eligible Residual Contract, multiplied by (2) the MMR [monthly monitoring rates] multiple used to determine the sales price of such Eligible Residual Contract in such Contract Sale (e.g., 30X multiple). Alder shall pay the Override Sale Residual due Divisional with respect to a Contract Sale within fifteen (15) days after receipt of the Net Sales Proceeds in such Contract Sale.

---

[5] Under the 2017 Divisional Sales Manager Agreement, "'Contract Sale' means the direct or indirect sale, exchange or transfer of a Contract by Alder or its affiliates to a third party (other than a transfers to Alder or any of its affiliates) as determined by Alder in good faith."

[6] Under the 2017 Divisional Sales Manager Agreement, "'Existing Divisional Contract' means an Eligible
Residual Contract personally generated by Divisional (taking into account of Section 6(c)) prior to the date hereof."

[7] Under the 2017 Divisional Sales Manager Agreement, "'Expected Sale Share' means, with respect to a Contract Sale of an Existing Contract, the amount that would be distributed to Divisional in respect of his Contract Participation if all Net Sales Proceeds from such Contract Sale were distributed to the equity holders of Parent (including Contract Participants) in respect of their equity in Parent in accordance with the terms of the LLC
Agreement."

Alder's payment of Override Sale Residual to Divisional shall be accompanied by a report computing the Override Sale Residual being paid and any Purchase Price Adjustments applicable thereto.

80.     Each form of Residual compensation is subject to Alder's "Sales Rules," which "set forth certain deductions to the compensation that Divisional may receive, and which set forth certain fees that may be charged to Divisional."  Alder reserves the right to "modify, change or eliminate [the Sales Rules] from time to time upon one (1) business day's notice." [§ 1.]

81.     Notably, each form of Residual requires, as a condition of payment, that the sales representative be "actively engaged in providing the Services" or "subject to an Approved Absence."  Thus, the Residual compensation is structured to prevent sales representatives from leaving Alder by requiring anyone who leaves to forfeit their hard-earned accrued compensation. [§ 6.]

82.     Within Alder, the Residuals described in the Agreements are commonly referred to as one's "book of business."

83.     In printed recruiting advertisements, verbal recruiting pitches, and post-recruiting intracompany discussions, Alder represents that a "book of business" is a fully vested form of compensation that a sales representative can "cash out" at any time. [*See e.g.* Ex. A.]

84.     However, as set forth above, the fine print of the Agreements provides that Residuals are forfeited upon departure from the Company.

85.     The forfeiture upon departure stands in stark contrast to the recruiting promises alleged above, including that "accounts you sell continue to generate value for you throughout their life." [Ex. A.]

{01907797-1 }

86. Plaintiffs relied on the printed recruiting advertisements, verbal recruiting pitches, and post-recruiting intracompany discussions in entering and performing under their Agreements.

87. Divisional managers are incentivized to defer compensation in order to build their Residual more quickly. Alder represents to its Divisional managers that by accepting a Residual-only compensation model with no monthly draw, they are building long-term wealth.

88. For example, Mr. Ennis did not receive *any* cash compensation from Alder during the first 11 months he worked for the Company. In or about January of 2016, Connor Rockwood convinced Mr. Ennis to agree to a residual-only compensation plan with no monthly payments by showing him a wall with framed photos and statistics of sales representatives who earned monthly residuals in the mid-to-high five-figure range. In addition, Mr. Rockwood assured Mr. Ennis that the display was old and that the top rep was currently bringing in over $165,000 per month in residual income. However, Mr. Ennis subsequently learned that all of these representations are false because most divisional managers earn $10,500 a month or less—with only three earning more. He also learned subsequently that the individual supposedly earning $165,000 per month was actually earning $20,000 per month.

89. Similarly, because of misrepresentations made to Mr. Jesclard in 2011 of a similar nature as those made to Mr. Ennis, Mr. Jesclard elected not to receive any cash compensation from Alder during the first 10 months he worked for the Company.

90. In many cases, Alder promises certain bonus incentives to sales representatives who meet certain performance goals. However, once the performance goals are met, Alder

either reneges on the promises entirely or adds the requirement that the sales representatives must sign up for the following year in order to receive the incentives they were already earned.

91.     For example, Mr. Ennis's team was promised a $75,000 bonus if they sold over 2,000 accounts as a team.  However, after the team sold 4,000 accounts, Alder refused to provide the bonus unless Mr. Ennis signed a new employment agreement with Alder.  Mr. Ennis reluctantly signed the new employment agreement, but the $75,000 bonus was never paid.

92.     As another example, Connor Rockwood told Mr. Ennis that if his team hit their goals, Mr. Ennis would receive a $150 override on each account Mr. Ennis recruited, to be paid out in Mr. Ennis's backend.  However, even though the team met its goals, Mr. Ennis never received the $150 override on the 550 accounts that he sold.

93.     As another example, Mr. McCartney, Mr. Kaufman, and Mr. Rockwood told Mr. Ennis in April of 2018 that if he installed 60 accounts per month, he would receive a monthly salary of $8,000.  In May of 2018, Mr. Ennis sold 64 accounts.  On June 5, 2018, Mr. Ennis emailed Mr. McCartney and Mr. Kaufman requesting a raise to $8,000 a month.  Mr. McCartney emailed his approval in response.  However, Mr. Ennis never received the $8,000 monthly salary.

### 5.   Alder Uses a Flawed System of Tracking Sales Representatives' Residual Compensation that is Intentionally Designed to Hide Material Information and Provide a False, Inflated View of Residual Amounts

94.     Radix is a "sales representative portal" that has been used by Alder for several years.  According to the Agreements, Radix contains Alder's Code of Conduct, Guidebook, Residual Sales Rules, and other policies.  It also contains information regarding sales representatives' account generation and Residuals.

{01907797-1 }

95.     The account and sales information stored in Radix form the basis for commission and residual calculations.

96.     Throughout Plaintiff's tenure with Alder, Kyle DeMordaunt repeatedly stated to Plaintiffs (and other sales representatives) that Radix was a reliable and available source of information regarding their "books of business."  Such statements were false; Radix was neither reliable nor consistently available.

97.     Mr. Schanz and Mr. DeMordaunt both expressed orally to Mr. Summers their desire to restrict sales representatives' visibility into their expenses and deductions in Radix and elsewhere, so that sales representatives would see an overstated residual amount.

98.     Accordingly, Radix only displayed sales statistics and some but not all of the elements comprising a "book of business."  Radix omitted important elements of a "book of business," such as deductions, expenses, cash advances, and adjustments.  This was by design, to induce sales representatives to continue working for Alder under the Residual compensation model based on a false understanding that they had accrued and were continuing to accrue a highly valuable "book of business."  Thus, each time Radix was accessed by sales representatives on their phones and other devices, information about Residuals that was false and misleading by omission was provided.

99.     Doug Kaufman, Vice President of Sales at Alder, admitted via text message to Mr. Vanleeuwen on October 9, 2018, that the residual information provided to sales representatives in Radix was incorrect.  Mr. Kaufman made the same admission to Shawn Harding shortly before Mr. Harding resigned from Alder.

27

100.    When sales representatives request account generation or Residual information that is more accurate than what Radix provides, their requests are ignored or refused, and the sales representatives often face retaliation.

101.    For example, with respect to Mr. Vanleeuwen:

a.  On October 25, 2018, James Summers stated in an email to Mr. Vanleeuwen, "There are no other reports outside of Radix with residual amounts."

b.  On October 26, 2018, Dane McCartney stated in an email to Mr. Vanleeuwen that he should make his request for residual information again "after backends."

c.  On November 3, 2018, Mr. Vanleeuwen reiterated his request for "a comprehensive breakdown of my current residual" to Mr. McCartney, Mr. Summers, Mr. DeMordaunt, and one other individual at Alder.  His email was ignored.

d.  Mr. Vanleeuwen then followed up by text message on November 7, 2018, with Doug Kaufman, who the next day provided the excuse that no one could provide the requested information because the Company had "switched monitoring companies."

e.  Mr. Vanleeuwen followed up by text message on November 13 and 14, 2018, with Mr. Kaufman, who told him to be "a little more patient."

f.  In December of 2018, Mr. Vanleeuwen's monthly payment amount was reduced.

g.  In January of 2019, Alder filed four COJs against Mr. Vanleeuwen and terminated his employment.

{01907797-1 }

h.  Mr. Vanleeuwen only received information regarding his Residuals after Alder

commenced legal action and Mr. Vanleeuwen retained legal counsel.

102.  The other Plaintiffs had similar experiences of making multiple direct requests for

financial and accounting information, which requests were ignored and refused.  Occasionally,

they were told not to worry about the accounting details because "Adam takes care of his big

hitters."

103.  On or about June 23, 2020, Mr. Summers wrote to Mr. Schanz, expressing

concerns about the false, inflated representations that Mr. Schanz and others were making to

sales representatives regarding their "books of business."  Mr. Schanz called Mr. Summers

shortly thereafter and instructed him not to say those kinds of things over email so as not to

create a paper trail.  The next day, Mr. Summers expressed criticism of Mr. Schanz's practice of

providing false and misleading information to sales representatives and asked Mr. Christian why

he continues to defend and cover for Mr. Schanz.  Mr. Christian responded, "Maybe it's your

time to go."

104.  One of Mr. Summers' major projects at Alder was to oversee the development of

a new DOMO reporting site.  Mr. Summers' goal for the project was to display all elements

comprising a "book of business" so that sales representatives could have an accurate

understanding of their Residuals.  The DOMO project began at the end of 2019.  The Residual

portion of the project began in earnest in mid-2020.

105.  To Mr. Summers' dismay, Mr. Schanz and Mr. DeMordaunt instructed Mr.

Summers to make the new DOMO site just as non-transparent as Radix.  In or around July of

2020, Mr. Schanz went to Mr. Summers' office for a demonstration of the DOMO project.  Mr.

{01907797-1 }

Summers loaded AJ Kilgore's data as an example.  The program showed Mr. Kilgore's earnings, as well as his deductions, expenses, and adjustments.  It showed that Mr. Kilgore's Residual balance was a negative number, approximately -$45,500.  Mr. Schanz did not like the fact that DOMO would display negative numbers to sales representatives and said this would "confuse the s*** out of guys."  Mr. Schanz told Mr. Summers to make revisions and then show it to him again.

106.    The next day, Mr. Summers gave another demonstration to Mr. Schanz, Mr. DeMordaunt, Tim Larsen, and Pete Romney.  Mr. Summers had set up filters so that Mr. Schanz could customize what information would be visible to sales representatives.  Mr. Schanz and the other individuals expressed approval and excitement over being able to use the filters to provide a false and inflated picture of residuals to sales representatives.  With Mr. Schanz in charge of DOMO's informational filters, DOMO provides information about Residuals that is false and misleading by omission each time it is accessed by sales representatives on their phones and other devices.

107.    When Plaintiffs and other sales representatives have requested corrections to their account generation or Residual information, their requests have been ignored or refused, and the sales representatives have often faced retaliation.

108.    For example, over a period of approximately two years, Mr. Ennis repeatedly requested approximately $15,000 in corrections to his accounts.  The corrections were never made.  When Mr. Ennis requested the changes directly from Mr. Schanz, Mr. Schanz responded in words to the following effect: "Shad you're talking about pennies here! This is chump change!

When you look at the big picture, these things don't mean anything at all! So stop going and trying to make all of these changes to your book and put your head down and go to work."

109.    Mr. Schanz has a practice of responding to requests for Residual information with promises that the requester's "book of business" is worth several million dollars.  Such misrepresentations are made in an effort to pacify the requester and avoid follow-up requests.  For example, Mr. Schanz represented to Mr. Vanleeuwen in or around December of 2018 that his book of business was worth $3 million.

110.    Alder hires an auditing firm to annually review Alder's records and determine the "contractor receivable" for each sales representative as of the end of each calendar year.  Alder then sends an email to each sales representative stating the "contractor receivable" amount without any documentation or explanation as to how the amount was calculated, what it means, or how it relates to the sales representatives' "book of business."

111.    The audit emails state that if the sales representative disagrees with the amount, they should furnish information to assist the auditors in reconciling the difference.

112.    When a sales representative responds to the audit emails, they receive no response.  For example, Mr. Vanleeuwen responded to the audit emails each year asking what the "contractor receivable" represented and received no response.

113.    In 2020, Alder's accounting records reflecting the Residual calculations for sales representatives' "books of business" from 2015 to 2017 were somehow deleted.  Mr. Summers notified Mr. Schanz that the information had been lost.  Mr. Schanz instructed Mr. Summers to create accounting records for 2015 to 2017 out of whole cloth that would substantiate Alder's financial statements.

114.    Mr. Summers protested that Mr. Schanz was asking him to falsify accounting records.  Mr. Schanz responded by stating that Mr. Summers' share in Alder was worth $1.3 million and increased Mr. Summer's share valuation to $1.7 million a few weeks later.  Mr. Summers refused to falsify the accounting records and was terminated a few weeks later, on September 14, 2020.

### 6.    Alder Has Failed to Properly Compensate Plaintiffs and Claimants under the Parties' Agreements

115.    Due to these and other improper accounting practices and Alder's failure to honor the Agreements and the parties' oral arguments, Alder has failed to pay Plaintiffs and Claimants the compensation owed to them, including Residuals, commissions, and bonuses, and has made improper deductions from their compensation.

116.    Alder has failed to pay Plaintiffs and Claimants their Monthly Residuals and Override Residuals on a consistent monthly basis and in the correct amounts, as required by the Agreements.

117.    Alder has failed to provide Plaintiffs and Claimants with monthly reports computing the Monthly Residuals and Override Residuals and identifying their Eligible Residual Contracts, the Monthly Monitoring Rate actually collected on those contracts, and Residual Compensation Rate payable with respect to those contracts, all as required by the Agreements.

118.    Alder has failed to pay all compensation owed to Plaintiffs and Claimants under the Agreements and otherwise, including commissions and bonuses, upon their termination.

119.    Alder has not paid Plaintiffs and Claimants any Residuals or other compensation since their termination.

{01907797-1 }

120.    On information and belief, Alder has a practice of charging business expenses to the accounts of Divisional Managers in excess of what is permitted under the compensation agreements, while also claiming tax deductions for Alder for the same expenses, often with the purpose and result of reducing Plaintiffs and Claimants' compensation to negative amounts.

### 7.  Alder Created an Unlawful Equity Plan in 2017

121.    The Agreements indicate that "Simultaneous with, but contingent upon, the execution of this Agreement, Divisional is being granted a Contract Participation in Alder Protection Holdings, LLC, a Delaware limited liability company and parent of Alder, pursuant to that certain Notice of Award and accompanying Award Agreement dated as of even date herewith, under the Alder Protection Holdings, LLC 2017 Residual Equity Plan." (Abbreviations removed.)

122.    In early 2017, Alder provided its Divisional Managers and other employees with a copy of the Residual Equity Plan (the "Plan").

123.    The Plan offers a security under federal and state law.  The Plan provides "a certificate of interest or participation in a profit-sharing agreement," an LLC interest, and an investment contract.

124.    On information and belief, Alder has never registered these securities in accordance with federal and state law.

{01907797-1 }

**8.   Defendants Have Fraudulently Transferred Alder Accounts and Amounts Earned by Sales Representatives to Cove Smart, LLC and Other Companies Owned by Mr. Schanz and Other Individual Defendants**

125.    In recent years, Mr. Schanz has created several entities and initiatives, including Cove Smart, LLC ("Cove"), Pando Holdings, LLC ("Pando"), and others referred to as Luna, Boerbol, and Rhodesian.

126.    Cove provides home security services in competition with Alder.  Cove was registered in Delaware and in Utah in or around March of 2018.

127.    Cove began selling the Alder Simple panel in or around 2018.

128.    Cove employees now occupy approximately one half of the executive floor at Alder's headquarters.

129.    Although Cove purports to be a sister company of Alder, Cove attempts to undercut Alder by taking sales representatives and installers out of the equation and instead allowing customers to purchase home security services online or in retail stores, with no contractual commitment for monitoring services and at lower monthly prices.

130.    Mr. Summers has compared Alder's customer list to Cove's customer list and observed home security accounts sold by Alder sales representatives that had been transferred to Cove.  He also observed Alder and Cove customers in the same neighborhoods, confirming that they are competitors.

131.    As a result of the lower prices available through Cove, Alder customers have canceled or chosen not to renew their contracts with Alder and instead obtained less expensive, no-contract security services through Cove.

132.    The result of the transfers from Alder to Cove is to deprive Alder sales representatives of residuals from the transferred accounts.

133.    Mr. Schanz owns the majority of membership units in Cove, Pando, Luna, Boerbol, and Rhodesian.

134.    Mr. Schanz has given some Cove units to high-level Alder employees (including, on information and belief, some or all of the Individual Defendants) with the apparent purpose of preventing these employees from raising concerns about conflicts of interest.

135.    In order to reduce the price point of its home security services and maintain profitability, Cove relies upon a discounted signal forwarding company (monitoring service), compared with the traditional signal forwarding company (monitoring service) that Alder had been historically using.

136.    Security accounts that rely on Alder's discounted signal forwarding company have a lower price point (acquisition multiple) at resale than security accounts that rely on the traditional signal forwarding company.

137.    In or around 2018, Alder built its Simple panel to run exclusively on the signal forwarding company that offered the lowest cost.  The Simple panel has been used for both Alder accounts and Cove accounts since 2018.

138.    There is very limited marketability for security accounts on Alder's Simple panel that uses the discounted signal forwarder.

139.    If Alder ultimately sells its security accounts that rely on the Simple panel (which is doubtful), it will not be able to obtain the 50x multiple that has been promised to sales representatives (or the 45x or 55x multiples that have also been promised).

{01907797-1 }

140.    The decrease in marketability of accounts due to Alder's signal forwarder selection has not been disclosed to sales representatives.  To the contrary, Alder continues to represent that sales representatives can expect a 50x multiple (or 45x or 55x multiple) when Alder sells its accounts to a third party.

141.    Defendants have unjustly enriched themselves by transferring value from Alder to Cove and the other entities Mr. Schanz and other Individual Defendants own.  For example:

a.  Defendants have taken out loans, from publicly traded institutions, to finance Cove and other entities and has collateralized these loans using Alder's assets, including the customer accounts owned in part by Alder sales representatives and the promissory notes signed by Alder sales representatives.  Because of these loans, if Alder were to ever sell its home security accounts to a third party, much of the proceeds would have been used to satisfy the debt collateralized on the home security accounts and the promissory notes.  Very little would be left for sales representatives.

b.  The loans taken out by Defendants for the benefit of these other entities were also collateralized and/or secured at least in part with Notes from Alder sales representatives.  On information and belief, Alder did not inform its lenders that the Notes were for fictitious loans in arbitrary amounts and were therefore of questionable validity and enforceability, at best.

c.  On information and belief, the development of the Simple panel was financed with revenue from Alder accounts.  However, the Simple panel is now owned by

Luna, which, on information and belief, is owned in whole or in part by Mr. Schanz and/or other Individual Defendants.

d.   On information and belief, the real property where Alder's headquarters are located was placed in the name of Boerbol, whose parent is Rhodesian.  On information and belief, this is yet another way by which Mr. Schanz and/or other Individual Defendants are siphoning money from Alder accounts to enrich separate entities owned by them.

e.   On information and belief, Alder's CRM was developed using financing and revenue from Alder accounts but was then placed in a separate entity called Pando, of which Mr. Schanz is believed to be the majority owner.  On information and belief, Pando has not repaid the financing from Alder nor compensated Alder for the value of the CRM system.

f.   Alder assigned its software developers to perform work for Pando.  On information and belief, Pando has not compensated Alder for these software development services.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

142.   Plaintiffs incorporate the preceding paragraphs by reference.

143.   Plaintiffs bring this action individually and as collective and class actions on behalf of Claimants, including all persons who are, or have been, employed by Alder as sales representatives within the applicable statutory period, and who, by means of the practices set forth above, failed to receive compensation owed to them or were otherwise harmed by Alder's tortious actions.

{01907797-1 }

144.    Alder's officers and directors are excluded from the Class.

### Collective Action Allegations: FLSA Claim

145.    Plaintiffs seek certification on behalf of all Claimants of a collective action and the facilitation of notice to similarly situated employees.  29 U.S.C. § 216(b).

146.    The FLSA requires employees to receive minimum wage and overtime compensation for workweeks at the regular payday for the period in which the workweek ends. 29 C.F.R. § 790.21(b).  Minimum wage and overtime earned in a particular workweek must be paid on the regular payday for the period in which such workweek ends.  29 C.F.R. § 778.106.

147.    The FLSA requires employers to pay hourly employees at least minimum wage for all hours worked and one and one-half (1.5) the employee's regular rate of pay for all overtime hours worked in excess of 40 hours in a single workweek.  29 U.S.C. §§ 206 and 207.

148.    Employers have the burden to show that their employees qualify for an FLSA exemption from minimum wage and overtime requirements.

149.    Employers who classify employees as exempt from minimum wage and overtime under the executive, professional or administrative exemptions must meet the salary basis test and must actually compensate their employees.  Moreover, employers who classify employees as exempt under the Outside Sales Exemption must comply with minimum wage and overtime requirements while the employees are in training.

150.    Employers who classify employees as exempt from minimum wage and overtime under the outside sales exemption must treat their employees in the manner that outside sales employees are generally treated, including by rewarding them for their sales efforts through commissions and otherwise with high compensation.

{01907797-1 }

151.     The members of the proposed FLSA Class would benefit from the issuance of a court supervised notice of the present lawsuit and the opportunity to join the present lawsuit as party plaintiffs (by filing written consent with the Court, pursuant to 29 U.S.C. § 216(b)).

152.     The members of the proposed FLSA Class are known to Alder, are readily identifiable, and can be located through Alder's records.

153.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs have submitted their written consents to serve as party plaintiffs and to join the proposed FLSA Class.

### *Class Action Allegations for Other Claims*

154.     The other statutory and common law claims may properly be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

155.     The requirements of Rule 23 are satisfied, as set forth in the following paragraphs.

156.     **Numerosity:**  The total number of members of the proposed Utah state law class likely exceeds 5,000 individuals.  The members of the class are so numerous that joinder of all members is impractical, and a class action is the only available method for the fair, equitable, and efficient adjudication of this controversy.

157.     **Commonality:**  There are common questions and issues of fact and law which predominate over any issues solely affecting individual members; specifically, whether Defendants, failed to pay compensation owed to the Plaintiffs and Claimants, fraudulently induced Plaintiffs to enter void or voidable contracts, committed securities fraud, and committed the other torts alleged herein.

{01907797-1 }

158.   **Typicality:**  The Plaintiffs' claims are typical of the claims of the proposed Class, in that each of these allegations pertains to Defendants' Company-wide policies and practices, not to their anecdotal treatment of individuals.

159.   **Superiority of Class Action:**  Since the damages suffered by members of the proposed Class (although not inconsequential) may be relatively small, the expense and burden of individual litigation by each member will likely make it impractical for the Class members to individually seek redress for the wrongful conduct alleged herein. Moreover, separate actions by each individual member of the proposed Class, and the resulting multiplicity of lawsuits, would cause undue hardship and expense for the Court and the litigants.  Finally, the prosecution of separate actions would also create a risk of inconsistent rulings.

160.   **Adequacy:** The Plaintiffs in this class action are adequate representatives of the proposed Class, since the Plaintiffs' claims are identical to those of the proposed Class, and thus, the Plaintiffs have the same interests in this litigation as the members of the proposed Class.  The Plaintiffs are committed to vigorous prosecution of this case, and have retained competent counsel who are experienced in litigation of this nature.  The Plaintiffs are not subject to any individual defenses unique from those conceivably applicable to the Class as a whole.  The Plaintiffs anticipate no management difficulties in this litigation.

161.   **Notice to the Proposed Class:**  The members of the proposed Class would benefit from the issuance of a court-supervised notice of the present lawsuit.  The members of the proposed Class are known to Alder, are readily identifiable, and can be located through Alder's records.  The notice to the proposed class members will include an introduction, a short description of the lawsuit including Plaintiffs' claims and Defendants' response to those claims,

information on how to opt out of the lawsuit, a section informing potential class members that retaliation is not permitted if they are currently employed by Defendants, the effect of opting out of the lawsuit, and contact information for the class's counsel for any questions they may have, as well as a notice that this case is on a contingency fee with an explanation of what that entails and the amount to which the class's counsel is entitled if successful.  Along with the notice, we will attach an "Opt In" form for potential class members who choose to out into the FLSA Collective Action and an "Opt Out" form for potential class members who choose to opt out of the Class Action claims.

## FIRST CAUSE OF ACTION

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, 29 U.S.C. § 201,**
***et. seq.* (Failure to Pay Minimum and/or Overtime Wage)**

**(All Defendants)**

162.    Plaintiffs incorporate the preceding paragraphs by reference.

163.    The FLSA regulates the payment of wages by employers whose employees are "engaged in commerce or engaged in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).

164.    Alder, Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are each employers within the meaning of 29 U.S.C. § 203.

165.    Defendants are required to adhere to the minimum and overtime pay requirements of the FLSA because Alder is an enterprise engaged in commerce and all of its employees are engaged in commerce.

166.    The practices described above, including but not limited to employee misclassification, failure to pay minimum wage and overtime during training time, and the withholding and claw back of earned compensation, are company-wide practices that applied to sales representatives nationwide.  See paragraphs 23, 27, 41-70, 80-81, 84, 87-93, and 115-120, among others.  These practices caused the Plaintiffs and proposed FLSA Class members to be deprived of regular and overtime pay.

167.    Plaintiffs and members of the proposed FLSA Class typically worked more than 40 hours per week; thus, much of the uncompensated work performed by the sales representatives was subject to overtime compensation.

168.    In withholding and clawing back the wages of Plaintiffs and members of the proposed FLSA Class, Defendants caused and/or attempted to case these employees' earnings to fall below minimum wage.

169.    Defendants acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA.

170.    Plaintiffs and members of the proposed FLSA Class are entitled to the amount of unpaid regular and overtime wages beginning three years prior to the filing of this Complaint because Defendants acted knowingly and willfully and/or showed reckless disregard as to whether their conduct was prohibited by the FLSA.

171.    Plaintiffs and members of the proposed FLSA Class are entitled to recover the amount of unpaid regular and overtime wages and an award of liquidated damages equal to the same amount, as described by section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b).

Plaintiffs and members of the proposed FLSA Class are also entitled to an award of prejudgment interest and attorneys' fees and costs.

<u>**SECOND CAUSE OF ACTION**</u>

**VIOLATION OF THE UTAH PAYMENT OF WAGES ACT,
UTAH CODE § 34-28-1, et seq.**

**(All Defendants)**

172.    Plaintiffs incorporate the preceding paragraphs by reference.

173.    Alder, Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are each employers within the meaning of Utah Code Ann. § 34-28-2 and 29 U.S.C. § 203.

174.    Defendants, in violation of UPWA, failed to pay wages to Plaintiffs and the members of the proposed Class by means of the practices described above, including in paragraphs 84, 87, 93, 115-120.

175.    In further violation of the UPWA, Defendants required Plaintiffs to return part or all of their wage, salary, or compensation through enforcement of the Notes and COJs as set forth above, including in paragraphs 41-68, 80-81, and 141.

176.    As a direct and proximate result of Defendants' violations of the UPWA, as set forth herein, Plaintiffs have sustained damages, including loss of earnings for hours of regular time worked for Alder and/or for contractually based earnings, in an amount to be established at trial, in excess of $10,000 in the aggregate.

177.    Defendants have not acted in good faith nor with reasonable grounds to believe that their actions and omissions were not in violation of the UPWA.

178.    Plaintiffs and Claimants are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages under the UPWA.  Plaintiffs and Claimants are

also entitled to statutory damages pursuant to § 34-28-9.5(3)(b) and to an award of prejudgment interest and attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

#### (Alder)

179. Plaintiffs incorporate the preceding paragraphs by reference.

180. The parties' written and oral agreements obligated Alder to make certain commission and other payments to Plaintiffs and Claimants. *See* paragraphs 65-66 and 70-73.

181. Plaintiffs and Claimants fulfilled their obligations to Alder under the agreements, chiefly by providing sales representation services to Alder.

182. Alder has breached its obligations to Plaintiffs and Claimants by, among other things, failing to pay commissions; failing to pay Monthly Residuals; failing to provide monthly reports computing the Monthly Residuals and detailing the Eligible Residual Contracts, the MMR actually collected thereon, and the RCR payable with respect thereto; failing to pay Override Residuals; and failing to provide monthly reports computing the Override Residuals. *See* paragraphs 115-120.

183. Plaintiffs and Claimants have been harmed by Alder's failure to pay commissions and other amounts owed to them and are entitled to damages in the form of the unpaid amounts, plus interest. Plaintiffs and Claimants are also entitled to attorney fees and costs.

### FOURTH CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

#### (Alder)

184. Plaintiffs incorporate the preceding paragraphs by reference.

{01907797-1 }

185.    The parties' written and oral agreements provided for Plaintiffs and Claimants to earn commissions and other payments through their work for Alder.

186.    Alder took improper actions with the purpose of preventing Plaintiffs and Claimants from receiving and/or retaining compensation for work performed under their agreements with Alder, including, without limitation, (1) by charging fees and deducting from Plaintiffs' and Claimants' compensation to reduce their compensation, often to a negative amount (*see e.g.* paragraphs 65-67  and 120), (2) by failing to provide transparent accounting (*see e.g.* paragraphs 94-114), (3) by inducing Plaintiffs and Claimants to defer large amounts of compensation, knowing that the parties' agreement limited Alder's liability to such amounts earned in the previous twelve months and otherwise limited remedies against Alder, and knowing that Plaintiffs and Claimants would forego their entitlement to future payments under the agreement if they quit (*see e.g.* paragraphs 74, 78, 81, 84-89), and (4) by permitting Alder customers and resources to be transferred without value or without adequate value to third-party entities owned in whole or in part by Mr. Schanz, depriving sales representatives of Residual compensation under the Agreements (*see e.g.* paragraphs 125-41).  Alder thus denied to Plaintiffs and Claimants the fruits of their agreements with Alder.

187.    Plaintiffs and Claimants have been harmed by Alder's failure to pay commissions and other payments owed to them and are entitled to damages in the form of the unpaid amounts, plus interest. Plaintiffs and Claimants are also entitled to attorney fees and costs.

{01907797-1 }

## **FIFTH CAUSE OF ACTION**

### **VIOLATION OF UTAH SALES REPRESENTATIVE COMMISSION PAYMENT ACT UTAH CODE § 34-44-101, et seq.**

#### **(Alder)**

188.   Plaintiffs incorporate the preceding paragraphs by reference.

189.   Plaintiffs and Claimants are sales representatives who solicit orders for Alder's products and/or services and are compensated in whole or in part by commission.

190.   Alder, is a principal within the meaning of Utah Code Ann. § 34-44-102.

191.   The parties' written and oral agreements obligated Alder to pay Residuals and certain other commissions to Plaintiffs and Claimants, which Alder failed to pay. *See e.g.* paragraphs 71-72, 76-79, and 115-120.

192.   Alder has breached these agreements and violated Utah Code § 34-44-202(1) by failing to pay Residuals and other commissions owed to Plaintiffs and Claimants.

193.   Alder has further violated Utah Code § 34-44-202(2) by failing to pay all outstanding amounts owed within 30 days of their termination for amounts owing on the date of termination and within 14 days for amounts becoming due after the date of termination. *See e.g.* paragraph 119.

194.   Alder also violated Utah Code § 34-44-201(3) by refusing to provide Plaintiffs and Claimants with a copy of their written agreements with Alder. *See e.g.* paragraph 73.

195.   Plaintiffs and Claimants have been harmed by Alder's various breaches of this statute and are entitled to damages in the form of the three times the unpaid amounts, plus interest.  Plaintiffs and Claimants are also entitled to attorney fees and costs pursuant to Utah Code Section 34-44-301.

{01907797-1 }

## SIXTH CAUSE OF ACTION

### (COMMON LAW FRAUDULENT INDUCEMENT)

### (All Defendants)

196.   Plaintiffs incorporate the preceding paragraphs by reference.

197.   Defendants had a policy and practice of inducing Plaintiffs and Claimants to sign the Notes and the COJs and written Agreements through representations that were false and/or misleading by omission.  These misrepresentations included but were not limited to:

a.   That the Promissory Notes and COJs were standard employee onboarding forms. *See* paragraph 42.

b.   That the sales representatives would have a vested ownership in the residuals earned under the Agreements. *See* paragraphs 18, 30-35, 83.

c.   That the sales representatives would profit at the time their security accounts were sold by Alder to a third party for a 50x multiple, regardless of when the sale occurred. *See* paragraphs 30-35.  That compensation reported to the IRS on 1099 forms was income to Plaintiffs and Claimants that was fully earned. *See* paragraphs 56 and 57.

d.   That the sales representatives' own "books of business" were worth extremely large amounts. *See* paragraphs 30-36, and 109.

e.   That sales representatives from prior sales seasons were earning amounts far in excess of their actual income. *See* paragraphs 31, 35, and 88.

f.   That Alder was entitled to withhold amounts previously earned by Plaintiffs if they chose to not sign the Notes and COJs. *See* paragraphs 43-46.

198.    These misrepresentations were material to Plaintiffs' and Claimants' decision to either work or continue to work for Alder and to execute the various Notes and COJs that were presented to them throughout the course of their relationship with Alder.  Plaintiffs and Claimants relied on these misrepresentations in executing the Notes and COJs.

199.    Alder and the Individual Defendants knew the misrepresentations were false and misleading at the time they were made and made them with intent to fraudulently induce Plaintiffs and Claimants to sign the Notes and COJs.

200.    Plaintiffs and Claimants seek rescission of the Notes and COJs, as well as attorney fees and costs.

201.    Plaintiffs and Claimants are also entitled to punitive damages because Defendants engaged in these fraudulent actions in an intentional, willful, and malicious manner, and in knowing and reckless disregard of the rights of Plaintiffs and Claimants.

## SEVENTH CAUSE OF ACTION

### (COMMON LAW FRAUD)

### (All Defendants)

202.    Plaintiffs incorporate the preceding paragraphs by reference.

203.    Defendants had a policy and practice of inducing Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services through representations that were false and/or misleading by omission.

204.    Defendants' misrepresentations included but were not limited to:

   a.    Statements in recruiting brochures and other advertising and recruiting materials that Alder's Residual compensation plan was designed to enable Plaintiffs and Claimants to build long-term wealth. *See e.g.* paragraphs 29-36, Exhibit A.

{01907797-1 }

b. Statements by Adam Schanz and other executives that the sales representatives' own "books of business" were worth large amounts, up to millions of dollars. *See e.g.* paragraphs 32, 36, and 109.

c. Statements in recruiting brochures and other advertising and recruiting materials that sales representatives from prior sales seasons were earning amounts far in excess of their actual income. *See e.g.* paragraphs 31, 35, and 88.

d. Statements in 1099 forms that compensation was income to Plaintiffs and Claimants that was fully earned. *Se e.g.* paragraphs 56 and 57.

e. Statements that by deferring upfront compensation under Alder's Residual compensation plan, Plaintiffs and Claimants would earn more money overall. *See e.g.* paragraphs 29, 30, 32-34, 87-89.

205. The material information that Defendants withheld and concealed from Plaintiffs and Claimants included but was not limited to:

a. That all monthly and other payments made to Plaintiffs and Claimants were subject to claw back under the Notes and COJs. *See e.g.* paragraphs 41, 48, 50-52, 55, and 65-67.

b. That all "books of business" and Residuals were subject to forfeiture upon Plaintiffs' and Claimants' termination of their relationship with Alder. *See e.g.* paragraphs 81-85.

c. That all estimates of the value of Plaintiffs and Claimants' "books of business" were based on a hypothetical valuation if Alder were to find a buyer of its

accounts and that the buyer paid a competitive multiple for each account. *See e.g.* paragraph 36.

206.    That Alder customers and resources were being diverted without value or without adequate value to third-party entities owned in whole or in part by Mr. Schanz, depriving sales representatives of Residual compensation (*see e.g.* paragraphs 125-41).  Alder and the Individual Defendants knew the misrepresentations and omissions were false and misleading at the time they were made.

207.    Defendants intended for Plaintiffs and Claimants to rely on these misrepresentations and omissions in deciding to work for Alder, in agreeing to Residual-based compensation plans (including the 2017 Residual Equity Plan), and in executing the Agreements, Notes, and COJs.  Ultimately, Defendants' goal was to exploit Plaintiffs and Claimants by fraudulently inducing them to work for little or no compensation.

208.    Defendants' misrepresentations and omissions were material to and were relied on by Plaintiffs and Claimants with respect to their decisions to work for Alder, to agree to Residual-based compensation plans (including the 2017 Residual Equity Plan), and to execute the Agreements, Notes, and COJs.

209.    In most cases, the amount stated in the Notes and COJs did not correspond to any compensation, loan, advance or other cash amount provided to Plaintiffs and Claimants by Defendants.

210.    To the extent the amount stated in the Notes or COJs did correspond to actual payments by Defendants, the amount had been reported as income on 1099 forms, triggering

Plaintiffs' and Claimants' obligation to pay income taxes on the amount.  Defendants later filed COJs to recover these amounts, claiming they were loans or advances.

211.    Plaintiffs and Claimants – particularly those who deferred their compensation – realized too late that they were not building long-term wealth because their Residuals were forfeited as soon as they left Alder.

212.    Plaintiffs and Claimants have been harmed by Defendants' fraudulent acts and are entitled to actual damages, including but not limited to:

    a.  The amount of the income taxes that Plaintiffs and Claimants paid on supposed income reported on 1099 forms that Defendants subsequently collected or attempted to collect as loans;

    b.  The attorney fees and costs expended in opposing the COJs (in other actions);

    c.  The amount of any judgments paid based on the Notes and COJs (in other actions);

    d.  The Residuals or "books of business" that Plaintiffs and Claimants were promised as part of Alder's fraudulent scheme but purportedly forfeited by resigning or being terminated by Alder; and

    e.  Disgorgement of Alder's profits resulting from its fraudulent scheme to induce Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services.

213.    Plaintiffs and Claimants are also entitled to punitive damages because Defendants engaged in these fraudulent actions in an intentional, willful, and malicious manner, and in knowing and reckless disregard of the rights of Plaintiffs and Claimants.

214.   Plaintiffs and Claimants are also entitled to attorney fees and costs.

## EIGHTH CAUSE OF ACTION

**(SECURITIES FRAUD, Utah Code § 61-1-1, et seq. and Section 10(b) of the Exchange Act and Rule 10b-5)**

**(All Defendants)**

215.   Plaintiffs incorporate the preceding paragraphs by reference.

216.   Residuals are an interest in future revenue streams from customer accounts and are therefore "securities" under Utah and federal law.  The LLC equity interests offered in the Alder Equity Plan are also "securities" under Utah and federal law.  These interests are referred to collectively as the "Securities."

217.   The Securities constitute "a certificate of interest or participation in a profit-sharing agreement," an LLC interest, and an investment contract.

218.   In connection with the offer and sale of these Securities to Plaintiffs and Claimants, Defendants directly and indirectly:

   a.   employed a device, scheme, or artifice to defraud;

   b.   made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.   engaged in acts, practices and courses of business which operated as a fraud or deceit upon Plaintiffs.

219.   As set forth in the preceding cause of action, Defendants engaged in a fraudulent scheme and made misrepresentations, omissions, and/or misleading statements to Plaintiffs and

{01907797-1 }

Claimants, which included inducing them to work in exchange for Defendants' offer and/or transfer to Plaintiffs and Claimants of the Securities.  Those allegations are incorporated here.

220.    In addition, specifically with respect to the Residual Securities and in order to create a false impression of the inflated value of the Residual Securities, Mr. Schanz and Mr. DeMordaunt instructed Mr. Summers to withhold material information from sales representatives regarding the value of their Residuals, such as deductions, expenses, cash advances, and adjustments in order present a false and inflated view of the value of the Residuals and thereby induce Plaintiffs and Claimants to continue providing services to Alder in exchange for the Residuals. *See* paragraphs 38, 97, 98, and 105.  Mr. Summers had previously been providing Invested Capital Reports with such information to sales representatives upon request. *See* paragraph 38.

221.    Consistent with such direction, Mr. Summers stopped providing Invested Capital Reports to sales representatives in 2018. *See* paragraph 38.  Thereafter, Plaintiffs' and Claimants' requests for this information were ignored or refused. *See e.g.* paragraphs 100-102.  Instead, Mr. Schanz and others provided false, inflated statements of the value of Plaintiffs' and Claimants' Residual Securities. *See e.g.* paragraphs 36, 37, 39, 102, 109.

222.    Also consistent with direction from Mr. Schanz and Mr. DeMordaunt, Radix and DOMO were intentionally designed to mislead sales representatives into believing that their Residuals were more valuable than they actually were in order to induce sales representatives to continue working for Alder under the Residual compensation model. *See* paragraphs 37, 97, 98, and 105-06.

{01907797-1 }

223.    Each time Radix and DOMO were accessed by sales representatives on their phones and other devices, information about Residuals that was false and misleading by omission was provided to sales representatives by Alder. *See* paragraphs 98 and 106.  On information and belief, such fraud is continuing to this day.

224.    During his tenure with Alder, Mr. Summers repeatedly pleaded with Mr. Schanz, Mr. DeMordaunt, and Mr. McCartney to provide full and accurate information to the sales representatives regarding their Residual Securities and to stop providing information that was false and misleading by omission. *See, e.g.*, paragraphs 38-39, 103, 105.

225.    For example, Mr. Summers had these conversations with Mr. Schanz and Mr. DeMordaunt in the summer of 2020, when Mr. Summers was overseeing the design of the DOMO reporting site.  Mr. Summers' goal for the project was to display all elements comprising the "book of business," so that sales representatives would have an accurate view of their Residual Securities. *See* paragraph 104.  Mr. Schanz and Mr. DeMordaunt preferred to use filters to omit material information from the DOMO site so that sales representatives would see only their sales statistics and not the deductions, expenses, cash advances, and adjustments that significantly reduced the value of their "book of business." *See* paragraph 105-06.

226.    The false and misleading misrepresentations and omissions in Radix and DOMO were a continuation of the fraud that began with Alder's recruiting of the sales representatives when they were given false and inflated earnings forecasts based on false information regarding the earnings of other sales representatives. *See* paragraphs 28-35.

227.    As an example of false and misleading information and omissions being used to convince a sales representative to continue providing services to Alder under the Residual model,

{01907797-1 }

in or around July 2020, Mr. Summers observed Mr. McCartney personally provide false information to sales representative AJ Kilgore regarding the value of his "book of business." *See* paragraph 39. Specifically, Mr. McCartney used a formula consisting of the product of some arbitrary monthly revenue amount and a 50x acquisition multiple less a debt amount. *See id.* Mr. McCartney's representation gave Mr. Kilgore a false and inflated view of the "equity" associated with his "book of business." *See id.* Mr. McCartney provided his assurance of "equity" to convince Mr. Kilgore to continue selling for Alder under the Residual compensation model. *See id.* Mr. Summers was incensed because he had recently told Mr. McCartney to stop using sales statistics (apart from deductions, expenses, cash advances, and adjustments) to communicate to sales representatives the value of their Residual Securities. *See id.*

228. At the time of these above-described misrepresentations and omissions, Plaintiffs and Claimants were ignorant of their falsity, and reasonably believed Defendants' representations, including the incomplete and misleading misrepresentations regarding the value of their Residuals, to be true.

229. The omitted and/or misrepresented information was material in that it greatly impacted Plaintiffs' and Claimants' decision to either begin working or continue working for Alder under the Residual-based compensation Agreements (including the 2017 Residual Equity Plan).

230. Defendants had an affirmative duty to fully and accurately disclose the omitted facts to Plaintiffs, including a full and accurate calculation of their respective Residuals, because: (a) Defendants Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney were corporate officers and/or other "insiders" in Alder with access to and possession of this information; (b) the

omitted facts were obviously material to Plaintiffs' and Claimants' and/or any reasonable

person's decision in selecting and remaining in a compensation plan; (c) Defendants had

fiduciary and/or contractual relationships and duties to Plaintiffs arising from Plaintiffs' status as

employees/agents and equity holders in Alder accounts; (d)  such disclosure is necessary to

correct Defendants' inaccurate, incomplete and/or misleading prior disclosures to Plaintiffs and

Claimants regarding the Residual compensation plans and resulting income to sales

representatives; and/or (e) other factors to be determined at trial.

231.    Defendants made the above-described materially false and misleading

representations and omissions for the purpose of furthering their fraudulent scheme and/or to

induce Plaintiffs to enter into and remain in Residual-based compensation Agreements.

232.    Defendants' misrepresentations, misleading statements, and omissions of material

fact were made with scienter in that they were known to be willfully, intentionally, knowingly

and/or recklessly false when made.

233.    Scienter is evident from Mr. Summers' numerous attempts to persuade Mr.

Schanz, Mr. DeMordaunt, and Mr. McCartney to stop providing misleading information and to

allow him to provide full and complete information regarding sales representatives' Residual

Securities. *See, e.g.*, paragraphs 38-39, 103, 105.  Scienter is also evident from Mr. Schanz's

statement that information should be withheld from sales representatives because it led them to

ask too many questions about why their Residual balance was so low, *see* paragraph 38, by Mr.

Schanz's and Mr. DeMordaunt's expressed desire to restrict visibility into expenses and

deductions in order to overstate the value of Residual Securities, *see* paragraph 97; by Mr.

McCartney's knowingly false representations to AJ Kilgore made after Mr. Summers specifically

{01907797-1 }

instructed him not to use sales statistics alone as a basis for representing the value of a "book of business," *see* paragraphs 39; by Mr. Schanz's rejection of Mr. Summers' transparent DOMO set-up and preference for using filters to hide expenses, deductions, advances, and adjustments from the DOMO display available to sales representatives, *see* paragraphs 105-06; and by Mr. Christian's statement that if Mr. Summers was becoming too critical of Mr. Schanz's practice of misrepresenting Residual information to sales representatives, perhaps it was his time to go, *see* paragraph 103.

234.    By virtue of the foregoing, Defendants willfully, intentionally, knowingly, and/or recklessly violated the Utah Uniform Securities Act, Utah Code Ann. § 61-1-1, as well as Section 10(b) of The Exchange Act and Rule 10b-5.

235.    Defendants also failed to register the Securities, in violation of Utah and federal law.

236.    Mr. Schanz, Mr. Christian, Mr. DeMordaunt, and Mr. McCartney are jointly and severally liable with Alder as control persons of Alder.

237.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered compensatory damages, consequential damages, special damages, and/or rescissionary damages, as are recoverable at law or equity, in an amount to be proven at trial, but including the value of the consideration provided in exchange for the security, together with interest, attorney fees and/or costs as provided by law.

238.    By virtue of the intentional and willful nature of Defendants' conduct, which conduct was intentional, willful, malicious, and in reckless disregard of Plaintiffs' rights,

{01907797-1 }

Plaintiffs are entitled to treble damages and punitive damages, together with 12% interest, attorney fees, and costs.

### NINTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)

### (Alder, Cove)

239.    Plaintiffs incorporate the preceding paragraphs by reference.

240.    To the extent Plaintiffs' and Claimants' relationship with Alder is not covered by valid and enforceable contracts, Plaintiffs assert this claim of unjust enrichment against Alder.

241.    With respect to Alder, Plaintiffs and Claimants have performed valuable services for Alder for which they reasonably expected to be compensated fairly but have not been compensated fairly.

242.    Alder has knowingly and willingly accepted and benefited from Plaintiffs' and Claimants' services.

243.    It would be inequitable and unjust for Alder to retain the benefits of Plaintiffs' and Claimants' services without providing fair compensation to them.

244.    Plaintiffs and Claimants have no contractual relationship with Cove.

245.    Alder customers and resources have been diverted without value or without adequate value to Cove and other entities that are owned in whole or in part by Mr. Schanz. *See e.g.* paragraphs 125-41.

246.    Cove has knowingly and willingly been enriched by the transfer to Cove of Alder customers in whose accounts Plaintiffs and Claimants hold Residual Securities, and by revenue streams from such accounts.

{01907797-1 }

247.    Cove has knowingly and willingly been enriched by the transfer of other assets and other value to them from Alder, which Alder acquired as a result of Plaintiff's and Claimants' labor and in which Plaintiff's and Claimants' hold an equity/residual interest, as alleged in paragraphs 125 to 141.

248.    It would be inequitable and unjust for Alder and Cove to retain value derived from Plaintiffs' and Claimants' services without providing fair compensation to them.

249.    Plaintiffs and Claimants are entitled to fair compensation for their services from Alder and to damages for unjust enrichment by Cove in amounts to be determined at trial.

## TENTH CAUSE OF ACTION

### (DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 AND 2202)

### (Alder)

250.    Plaintiffs incorporate the preceding paragraphs by reference.

251.    Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction," this Court is empowered to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

252.    There is an actual controversy between the parties as to whether the Notes are valid and enforceable and whether the Residual-based compensation Agreements are fully valid and enforceable by Defendants.

253.    Based on the facts alleged above, specifically in paragraphs 41-67, Plaintiffs seek a declaration that the Notes are invalid, void and/or unenforceable, pursuant to theories of fraud in the inducement, fraud in factum, unconscionability, unclean hands, and estoppel.

{01907797-1 }

254.    The Residual-based compensation Agreements are also unenforceable by Defendants pursuant to Utah Code § 61-1-22 because Defendants made these contracts in violation of Utah securities laws.

255.    In addition, all of the Agreements unconscionably deprive Plaintiffs and Claimants of effective means by which to enforce their rights and place an inordinate amount of liability on Plaintiffs and Claimants.  The provisions set forth in paragraphs 68 are substantively unconscionable.  These agreements were also procured in a procedurally unconscionable manner, as set forth in paragraph 73.  Therefore, the provisions cited in paragraph 68 are unenforceable by Alder.

256.    Plaintiffs reserve the right to seek further necessary and proper relief based on the Court's entry of declaratory judgment, pursuant to 28 U.S.C. § 2202.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Class, pray for judgment and the following specific relief against Defendants as follows:

1.    That the Court declare, adjudge, and decree that this action is a proper collective action and class action and certify the proposed Class and/or any other appropriate subclasses under FRCP Rule 23 and 29 U.S.C. § 216;

2.    That, at the earliest possible time, Plaintiffs be allowed to give notice of this action, or that the Court issue such notice, to all members of the proposed Class, with such notice informing them that this civil action has been filed, the nature of the action, and of their right to participate in this lawsuit;

60

3.      That this Court designate the named Plaintiffs as Class Representatives and their lawyers as Class Counsel;

4.      That the Court enter a Judgment and Decree declaring that Defendants willfully violated their legal duties under the FLSA as to the Plaintiffs and the members of the proposed FLSA Class;

5.      With regard to the FLSA claims, and as to the Plaintiffs and the members of the proposed FLSA Class, that the Court award unpaid regular and overtime compensation, together with an additional amount as liquidated damages, pre- and post-judgment interest, attorney fees, and costs;

6.      With regard to the UPWA violations, and as to the Plaintiffs and the members of the proposed Class, that the Court award the full amount of unpaid regular wages, as well as statutory damages, pre- and post-judgment interest, attorney fees, and costs;

7.      With regard to the contract claims, that the Court award commissions, Residuals, and all other amounts owing to them under their employment agreements, plus pre- and post-judgment interest attorney fees, and costs;

8.      With regard to the Utah Sales Representative Commission Payment Act claim, that the Court award three times the amount of unpaid Residuals and other commissions, plus interest, attorney fees, and costs;

9.      With regard to the fraudulent inducement claim, that the Court order rescission of the Notes and COJs and the Agreements;

10.     With regard to the fraud claim, that the Court award actual damages in at least the following amounts, plus punitive damages and attorney fees and costs:

    a.   The amount of the income taxes that Plaintiffs and Claimants paid on supposed income reported on 1099 forms that Defendants subsequently collected or attempted to collect as loans;

    b.   The attorney fees and costs expended in opposing the COJs (in other actions);

    c.   The Residuals or "book of business" that Plaintiffs and Claimants were promised as part of Alder's fraudulent scheme but purportedly forfeited by resigning or being terminated by Alder; and

    d.   Disgorgement of Alder's profits resulting from its fraudulent scheme to induce Plaintiffs and Claimants to provide Alder with uncompensated or undercompensated services.

11.    With regard to the securities fraud claim, that the Court award treble damages and punitive damages, together with 12% interest, attorney fees, and costs;

12.    With regard to the unjust enrichment claim, that the Court award just compensation for the services provided to Alder by Plaintiffs and Claimants and for disgorgement of unjust enrichment by Cove and the Individual Defendants;

13.    With regard to the declaratory judgment claim, that the Court declare that the Notes and COJs are not valid or enforceable and that the provisions of the Agreements in paragraph 74 are unenforceable by Alder; and

14.    That the Court order such further relief as the Court deems just and equitable, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices.

{01907797-1 }

**JURY DEMAND**

Plaintiffs and Claimants hereby demand trial by jury on all issues triable of right by jury.

DATED:  September 9, 2021.

<div style="margin-left:40%">

Respectfully Submitted,

CLYDE SNOW & SESSIONS


/s/ Matthew A. Steward
Matthew A. Steward
Shaunda L. McNeill
Victoria B. Finlinson
Keith M. Woodwell
*Attorneys for Plaintiffs*

</div>