# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHADRACH ENNIS, *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>ALDER PROTECTION HOLDINGS, LLC, *et al.*,<br><br>                Defendants. | **AMENDED MEMORANDUM DECISION AND ORDER**<br><br><br>Case No.  2:19-cv-512-CW<br><br>Hon. Clark Waddoups |

Plaintiffs Shadrach Ennis, Nicolaas Vanleeuwen, and Terrance Jesclard[1] (collectively, the "Named Plaintiffs" or "NPs"), commenced this action on July 22, 2019.  This matter is now before the Court for consideration of the parties' Joint Motion for Approval of Collective Action Settlement (the "Joint Motion") [ECF No. 353] seeking preliminarily approval of the Collective Action Settlement Agreement (the "Settlement Agreement") attached to the Joint Motion.  Following its initial review of the Joint Motion, the Court raised concerns regarding the issue of consent and ordered the Plaintiffs to file a supplemental brief on that issue.  [*See* ECF No.

---

[1]    Initially there was a fourth named plaintiff, Shawn Harding.  Pursuant to a stipulation of dismissal, all claims concerning Mr. Harding were dismissed with prejudice on June 19, 2020.  [*See* ECF No. 62.]

354.] On May 12, 2025, the Plaintiffs filed their Supplemental Brief. [*See* ECF No. 359.]

Following review of these filings, the applicable law, and for reasons discussed in more detail below, the Court hereby denies without prejudice the Joint Motion. The parties are advised that they are welcome to submit a revised motion and revised settlement materials that address the issues and concerns raised by the Court in this Memorandum Decision.

## FACTUAL BACKGROUND

### A. *The Parties*

The Named Plaintiffs all worked for Defendant Alder Protection Holdings, LLC in different but similar positions and for various periods between 2016 and 2019. Defendants Alder Protection Holdings, LLC and Alder Holdings, LLC (together "Alder") are companies engaged in the business of selling, installing, and servicing electronic security equipment. It is alleged that Alder conducts its business in all 50 states in the United States. [*See* ECF No. 157 at ¶¶5–8.]

As for the individuals named as Defendants, Adam Schanz is the founder, owner, manager, and CEO of Alder, Adam Christian is the General Counsel of Alder, Kyle DeMordaunt is the CFO of Alder, and Dane McCartney is the President of Sales for Alder. Defendant Cove Smart, LLC ("Cove"), is a Delaware limited liability company, under which, on information and belief, the majority of its membership interests are held by Mr. Schanz. [*See id.* at ¶¶8–13.]

Defendant Alder operates as a door-to-door sales company. It uses individual sales representatives to sell alarm services and products to residential customers.

It is alleged that Alder recruits its sales representatives through false representations and then exploits them into working for little or no compensation. Among other things, it is claimed that Alder incentivizes its sales representatives to forego immediate compensation in exchange for illusory promises of long-term wealth through the creation of "books of business" that will pay guaranteed returns to them in the future.  [*See id*. at ¶¶14-16.]  And, as most applicable with regard to the Joint Motion, it is alleged that Alder has failed to pay all similarly situated sales representatives a minimum wage and overtime as required under the FLSA. [*See id*. at ¶23, ¶¶145–153, ¶¶162–171.]

### B. *Relevant Procedural History*

Although the Named Plaintiffs filed their original complaint in July 2019, the operative pleading is the Third Amended Collective/Class Action Complaint ("Third Amended Complaint") filed September 9, 2021.  [*See* ECF No. 157.]  In the Third Amended Complaint, the Named Plaintiffs assert the following ten claims:  (1) violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA"); (2) violation of Utah's Payment of Wages Act, Utah Code § 34-28-1 *et seq*.; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) violation of the Utah Sales Representative Commission Payment Act, Utah Code § 34-44-101, *et seq*.; (6) common law fraudulent inducement; (7) common law fraud; (8) securities fraud under Utah Code § 61-1-1, *et seq*. and Section 10(b) of the Securities and Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5; (9) unjust enrichment; and (10) declaratory judgment asking that certain agreements and

notes be declared invalid.  [*See id.* at 2 & ¶¶ 162–256.]  The Named Plaintiffs sought to bring the FLSA claims as a nationwide collective and sought class action status under Fed. R. Civ. P. 23(b)(3) for the non-FLSA claims.  [*See id.*]

Although multiple motions to dismiss have been filed, they have been denied. To date none of the claims in the Third Amended Complaint have been dismissed. However, Defendants' have filed a motion for partial summary judgment regarding the collective claims, the putative class claims, and certain of the Named Plaintiffs' individual claims—a motion that remains pending.  [*See* ECF No. 265.]

On March 3, 2021, the Court conditionally certified a FLSA collective action and authorized the sending of a stipulated notice (the "Notice" [*see* ECF No. 90-1]) and consent (the "Consent" [*see* ECF No. 90-2]) to potential Opt-In Plaintiffs.  [*See* ECF No. 93].  On August 31, 2023, Named Plaintiffs moved to certify a class under Fed. R. Civ. P. 23(a) for the state law claims and Defendants moved to decertify the FLSA collective action.  [*See* ECF Nos. 297 & 298.]  Those motions remain pending.

On February 7, 2025, the parties jointly informed the Court that they had reached a settlement on the pending claims and defenses.  [*See* ECF No. 350.]  The Joint Motion for approval of that settlement was filed twenty days later.  [*See* ECF No. 353.][2]  Included as Exhibit 1 to the Joint Motion was a copy of the Settlement Agreement.  [*See* ECF No. 353-1.]

---

[2]    The Joint Motion seeks approval only of the FLSA collective action claims.  The Joint Motion does not seek approval of the settlement of any class action or individual claims.

On March 28, 2025, shortly after the Joint Motion was filed, the Court directed Named Plaintiffs' counsel to submit a supplemental brief addressing the following issues:

1. What authority does the court have to approve settlement of an FLSA collective action claim on behalf of the Opt-In Plaintiffs without obtaining the Opt-In Plaintiffs' affirmative consent?

2. If consent from the Opt-In Plaintiffs must be obtained before the proposed settlement can be approved, how do the parties propose obtaining such consent?

3. Does a conflict of interest under Rule 1.8(g) of the Utah Rules of Professional Conduct arise as a result of Plaintiffs' counsel seeking approval of an aggregate settlement seeking to resolve claims on behalf of both the Named Plaintiffs and the Opt-In Plaintiffs?

4. If such a conflict does arise, how does Plaintiffs' counsel plan to obtain written consent from the Opt-In Plaintiffs to proceed with the settlement, as required by Rule 1.8(g).

[*See* ECF No. 354 at 5.]  The Supplemental Brief was filed on May 12, 2025.  [*See* ECF No. 359.]

## ANALYSIS

*1. The Consent Issue*

After review of the Supplemental Brief, the Notice and Consent, and the relevant law on this issue, the Court has determined that a form of written express consent from each of Opt-In Plaintiff is required.  Notably, counsel appears to acknowledge that it has not received written express authority from any of the Opt-In Plaintiffs to settle their claims.  Instead, and relying on case law outside the Tenth Circuit, counsel argues that because the Notice informed potential Opt-In Plaintiffs "that the Named Plaintiffs may obtain a settlement," and the Consent

stated that they were choosing to "be represented in this matter by the named plaintiffs and counsel, Clyde Snow & Sessions, P.C., in this action," these statements establish that there is at least apparent authority, if not express authority, for the Named Plaintiffs or their counsel to settle the FLSA claims on their behalf. [*See* ECF No. 359 at 11–12.][3] The Court disagrees.

First, there is nothing in the Notice to support any grant of express authority to the Named Plaintiffs or their counsel to settle the collective FLSA claims. Indeed, counsel does not argue for such a finding.

Second, counsel's argument that the Notice and Consent should be construed to support a determination that the Opt-In Plaintiffs granted the Named Plaintiffs apparent "representative" authority to settle, is rejected. In making this argument, counsel relies on *Hood v. Uber Techs., Inc.*, No. 1:16-CV-998, 2019 WL 93546 (M.D.N.C. Jan. 3, 2019), an out of circuit unpublished case. *Hood*, however, is distinguishable and unpersuasive.

Notably, the court in *Hood* relied in large part on the fact that the notice sent to the opt-in plaintiffs expressly informed them "in two places that if they elected to join the lawsuit, they would be 'bound by any settlement or judgement.'" *Id*. at *2 (citations omitted). It is clear that there is no such statement in the Notice or Consent sent to the Opt-In Plaintiffs in this action. At best the Notice informs them

---

[3]    In making this argument, Counsel cites to and quotes the initial notice and consent filed with the initial motion seeking conditional certification of a collective action. [*See* ECF No. 359 at 12–13 (citing ECF Nos. 27-1 & 27-2).]. As noted above, the Notice and Consent authorized by the court are found at ECF Nos. 90-1 and 90-2. It appears that these notices are not identical. In ruling on the Joint Motion, the Court has only considered the Notice and Consent that it authorized. The Court is concerned, however, as to whether it was the Notice it authorized or some prior notice that was sent to potential Opt-In Plaintiffs.

that there is a "possibility of getting money or benefits that may come from a trial or a settlement" if they join the action. [*See* ECF no. 90-1 at 1.] But there is no language, like that cited in *Hood*, that informs the Opt-In Plaintiffs that they will be bound by any settlement determination made by the Named Plaintiffs or their counsel.

Moreover, the *Hood* court recognized that the better practice was for the consent to contain an express consent to settlement authority. *Id.* at *4 ("In hindsight, the consent form should have contained explicit settlement authority, if the parties were not contemplating giving the opt-in class members an opportunity to accept or reject the negotiated settlement.")

Accordingly, and without passing on the conflict-of-interest issues, the Court finds that a form of express affirmative consent to settle must be obtained from any Opt-In Plaintiffs. Therefore, in order to ensure that only Opt-In Plaintiffs who have affirmatively consented to the FLSA settlement will be bound, the Court agrees with counsel's recommendation that: (a) the Opt-In Plaintiffs must be informed in any draft settlement notice that their affirmative consent to settle the FLSA claims is required and that the Settlement Agreement must be revised to require that they must affirmatively consent and/or object before any FLSA settlement may be finally approved; (b) any draft settlement notices must include an expected breakdown of any settlement disbursements identifying each Opt-In's and each Named Plaintiffs estimated settlement payment; and (c) any settlement must include a mechanism

that may allow the Named Plaintiffs and any consenting opt-ins to settle the FLSA claims without those who do not respond or who object.  [*See* ECF No. 359 at 15–16.]

   If such changes are made, all confirmations of affirmative consents to settlement and any objections to the settlement must be presented to the Court.  In addition, counsel must file a declaration identifying those Opt-In Plaintiffs who have consented, those that have objected, and those who have not responded.

   *2.  Is the Proposed Settlement Fair and Reasonable?*

   Although the Joint Motion now before the Court must be denied for the reasons discussed above, the Court briefly notes some additional issues that the parties may wish to address before submitting a revised motion and proposed settlement agreement for approval.

   As discussed below, many of these issues touch on the reasonableness and fairness of the Settlement Agreement.  Although the Court's role in reviewing settlement agreements in a FLSA action is admittedly lower than the Court's role in approving a class action settlement under Fed R. Civ. P. 23, the Court is not simply a rubber stamp.[4]  The Court must still review the FLSA settlement for fairness and

---

[4]    Although the parties cite *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982), as authority that a FLSA collective action requires district court approval [*see* ECF No. 353 at 10–11 & n.21, 24, 25], the Tenth Circuit has not yet weighed in on whether such approval is required.  The view of many courts within the Tenth Circuit and the District of Utah, however, is that such approval is required, particularly when the parties affirmatively seek approval.  *See Bingham v. doTERRA Int'l, LLC*, No. 2:23-cv-0707, 2025 WL 1474036, at *1 n.11 (D. Utah May 22, 2025); *Pichler v. Cotiviti, Inc.*, No. 2:23-cv-0884, 2024 WL 4647871, at *1 (D. Utah Oct. 31, 2024); *Cazeau v. TPUSA, Inc.*, No. 2:18-cv-0321, 2020 WL 3605652, at *2–3 (D. Utah July 2, 2020); *see also Oates v. Kinder Morgan Energy Partners, L.P.*, No. CIV-19-1171, 2022 WL 18673322, at *1 (W.D. Okla. Jan. 18, 2022) ("The Court must approve the parties' settlement agreement in this FLSA case.") (citing *Lynn's Food Stores*, 679 F.2d at 1353-55); *cf. Slaughter v. Sykes Enters., Inc.*, No. 17-cv-02038, 2019 WL 529512, at *6 (D. Colo. Feb. 11, 2019) (noting that "while there is

reasonableness and to determine if it was the product of arms-length bargaining. With those standards in mind, below, by general topic, are some of the concerns the Court has identified.

### a. *The Settlement Payments and Distribution*

Pursuant to the Settlement Agreement, the Named Plaintiffs (the "NPs") will be receiving $333,300 each on average, for a total of $1,000,000 out of a gross settlement amount of $1,250,000, which represent 80% of the total gross settlement. [*See* ECF No. 353 at 6; ECF No. 353-1 at ¶4(c)(i).]   However, the 138 Collective Action Members (the "CAMs)[5] are receiving, at most, $1,811.59 each on average, which when reduced by attorneys' fees, costs, and administrative expenses is just $947.98 each and likely much lower when "legally mandated employee and employer taxes, if any are deducted."  [*See* ECF No. 353-1 at ¶4(c)(i)–(iii) & ¶6(a)–(d).]

As an initial payment-related matter, the Court is concerned that the Settlement Agreement does not fairly represent how much of the payment to be made to the NPs represents a FLSA claim payment.  The Court notes that the Joint Motion suggests that every Alder sales representative, including the NPs, worked a

---

disagreement over whether FLSA settlements *must* be approved by the Court, there does not appear to be disagreement at this time over whether FLSA settlements *may* be approved by the Court") (emphasis added).  In making their approval determinations these courts have engaged in a three-step inquiry:  1) does the settlement resolve a bona fide dispute; 2) if a bona fide dispute exists, is the settlement "fair and reasonable" to the parties involved; and 3) does the settlement contain a reasonable award of attorneys' fees. *See Bingham*, 2025 WL 1474036, at *1.  The parties have acknowledged that these three inquiries are appropriate here.  [*See* ECF No. 353 at 12–20.]

[5]    The Settlement Agreement identifies the Opt-In Plaintiffs as CAMs.  Thus, the Court will refer to the CAMS, rather than the Opt-In Plaintiffs, when discussing issues related to the fairness and reasonableness of the Settlement Agreement.

70-hour workweek without receiving overtime pay and was therefore entitled to additional overtime pay of $7,800 for each summer they worked.  [*See* ECF No. 353 at 13–14.].  But neither the Settlement Agreement nor the Joint Motion identify how much of the $1,000,000 payments to the three NPs represents a FLSA-related payment.[6]

The Court also points out that this is supposed to be a FLSA settlement—and only a FLSA settlement—and only payments that relate to the NPs' and CAMs' wage and hour claims should be paid out of the total settlement amount.[7]  Indeed, in the Joint Motion, the parties represent that "they have ***not reached a settlement*** to resolve the putative Rule 23(a) class action claims," which appear to be identical to the NPs individual claims.  [*See* ECF No. 353 at 5 (emphasis added).] The parties also note that they have agreed to dismiss the putative class claims without prejudice.  [*Id*.]

Despite that representation, it seems obvious that a large portion (if not all) of the $1,000,000 payment to the NPs must be for settlement of the NPs individual claims.  Yet the Settlement Agreement does not identify what portion of that payment is related to the settlement of their individual claims, settlement of the

---

[6]    As noted in the Joint Motion, the Plaintiffs submitted an expert report that opined that the overtime due the CAMS may have been no less than $1,863,030, a calculation far below the $250,000 settlement payment presented in the Settlement Agreement.  [*See* ECF No. 353 at 14; *see also* ECF No 277-2 (sealed) at 25, 44.]  That same report also opines that overtime due the NPs was less than one tenth of that due the CAMs.  [*See* ECF No. 277-2 (sealed) at 43.]

[7]    Notably, in the Third Amended Complaint, the claims asserted by the NPs under FLSA are identical to the FLSA claims of the CAMs.  That is, "Alder has failed to pay [all similarly situated] sales representatives minimum wage and overtime…."  [*See* ECF No. 157 at ¶23, ¶¶145–153, ¶¶162–171.]

FLSA claims, or some other settlement-related payment.  And while the Joint Motion states that $1,000,000 of the gross settlement amount "is attributable to the [NPs] eleven individual claims and other considerations, with only a smaller portion attributable to their individual FLSA claims" [*see* ECF No. 353 at 6], there is no similar representation in the Settlement Agreement.  Nor is their any clarity on what the "other considerations" referred to may be.  And, as noted above, neither the Joint Motion nor the Settlement Agreement identifies exactly how much, if any, of that $1,000,000 payable to the NPs has been apportioned to the FLSA claims under this approach.

Nor does the Settlement Agreement explain if some part of the payment to the NPs reflects an incentive or service award relating to the FLSA claims.  And if there is some award component, it is not disclosed how much that award is for each NP or how the award was calculated.

Courts in the Tenth Circuit have acknowledged that such incentive awards are only reasonable when they are tied to the work the NPs did, looking at the hours they committed to the action.  *See, e.g., Marquez v. Midwest Div. MMC, LLC*, No. 19-2362, 2022 WL 4355298 at *15 (D. Kan. Sept. 20, 2022) (assessing the reasonableness of service awards in an FLSA settlement based on "'the nature of each individual's involvement and the number of hours which he or she has invested in the case.'") (quoting *Grove v. ZW Tech, Inc.*, No. 11-2445, 2012 WL 1789100, at *7 (D. Kan. May 17, 2012); *Cazeau*, 2020 WL 3605652, at *14 (requiring, among other things, details as to the amount of time and effort the

-11-

plaintiffs expended before assessing the reasonableness of any incentive award).[8] Here, there is no information in the Joint Motion or Settlement Agreement addressing the hours the NPs spent on the litigation, the risks they faced by participating, or the benefits they provided. *See Cazeau*, 2020 WL 3605652, at *14 If incentive awards are part of any settlement payment, a discussion of how the incentive awards were calculated appears to be warranted so that the Court may assess the reasonableness of such payments. *See id.*

The proposed Notice Settlement and Settlement Agreement also indicate that the CAMs will "receive a prorated portion of the Distribution Amount [*i.e.*, the $250,000 less attorneys' fee and costs, the costs of the settlement administrator, and any mandated employee and employer tax deductions] in proportion to the amount of time they worked for Alder." [*See* ECF No. 353-1 at ¶6(d); ECF No. 353-1, Ex. A. ("Notice  Settlement) at 2.] But nowhere in the Settlement Agreement or Joint Motion is there any detail on how this prorated calculation will be performed.

The Court is also concerned why only the payments to the CAMs—and not the payments to the NPs—are to be reduced by "legally mandated employee and **employer** tax deductions." [*See* ECF No. 353-1 at ¶6(d) (emphasis added).]  First, there is no disclosure of what these tax deductions may be.  Second, it is not

---

[8]     Some other courts, however, have held that incentive awards are never appropriate in a class context, as another judge in this District recently observed in *Cotte v. CVI SGP Acquisition Trust*, No. 2:21-cv-0299, 2023 WL 5351018, at *4 (D. Utah Aug. 18, 2023).  In *Cotte* the court relied on an Eleventh Circuit decision, *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1258–59 (11th Cir. 2020), that, in turn, relied on some 19th Century Supreme Court decisions and the lack of statutory authority under the TCPA to make such an award.  Here, there is no statutory authority in the FLSA to make an incentive award. Nevertheless, these decisions appear to be outliers as incentive awards, albeit usually less than $10,000, are routinely approved in FLSA and class action settlements.

explained why the CAMs payments will be reduced by amounts that Alder is obligated to pay, particularly since there is no discussion in the Settlement Agreement that the NPs settlement will be similarly reduced.  Moreover, the Court notes that many FLSA settlements contain provisions that there will be no deductions from the settlement payments to fund the defendant/employer's tax obligations.  Further clarification on these payment-related issues appears necessary.[9]

### b.  Individual Claims Issues

To the extent this is not just a FLSA settlement, but also an individual claims settlement, the Court is not in a position to and will not weigh in on the fairness or reasonableness of any individual claims settlement.  The parties do not cite to any authority supporting such a review.  In fact, the parties affirmatively acknowledge that "only the settlement of the FLSA collective action … requires Court approval."  [ECF No. 353 at 7–8.]

As for the settlement of any individual claims, they can and should be dealt with in a separate settlement agreement.  Those claims could still be part of the overall joint stipulation to dismiss the entire action, with all the FLSA claims and the individual claims dismissed with prejudice, and the putative class action claims dismissed without prejudice, as contemplated in the Settlement Agreement.  [See ECF No. 353-1 at ¶10.]

---

[9]    Given that the NPs are receiving the bulk of the settlement payments, the Court is justly concerned that their interests (and their counsels' interest) in entering into this settlement may be in conflict with the interests of the CAMs, particularly since it appears that only the NPs have consented to any settlement.

c. *The Releases*

The parties should also review the release in the Settlement Agreement to ensure it is not overbroad. As one court has noted, the concern is that an employer may "use employee wages—wages that are guaranteed by statute—as a bargaining chip to extract valuable concessions from employees." *See Selk v. Pioneer Mem. Healthcare Dist.*, 159 F.Supp.3d 1164, 1178 (S.D. Cal. 2016) (citing *Moreno v. Regions Bank*, 729 F.Supp.2d 1346, 1351 (M.D. Fla. 2010)). This is one of the reasons why a FLSA settlement should relate only to claims for unpaid wages and nothing more, and why the releases should be limited to the wage claims at issue. *See Cazeau*, 2020 WL 3605652, at *9 (noting that "'concessions unrelated to the substance of FLSA claims have no place in FLSA settlements'") (quoting *Sanchez v. RM Wireless, Inc.*, No. 6:17-cv-1785, 2018 WL 1866050, at *3 (M.D. Fla. Mar. 28, 2018) (citing *Moreno*, 729 F.Supp.2d at 1351–52)).

As discussed above, the Settlement Agreement should be singularly focused on the FLSA claims—nothing else. Yet the release given by the CAMs in the Settlement Agreement appear to cover not only all the FLSA claims but also "**all other claims and causes of action asserted in the Action.**" [ECF No. 353-1 at ¶3 (emphasis added).]

Such a release might presumably include all of the following asserted claims: violation of Utah's Payment of Wages Act [*see* ECF No. 157 at ¶¶172–178]; breach of contract regarding commissions or residuals [*id.* at ¶¶179–183]; breach of good faith and fair dealing relating to commissions and residuals [*id.* at ¶¶184–187];

breach of Utah's Representative Commission Payment Act [*id.* at ¶¶188–195]; fraudulent inducement concerning standard employee onboarding forms such as promissory notes, confessions of judgments, and other "written Agreements"[10] [*id.* at ¶¶ 196-201]; fraud in recruiting brochures and statements in Form 1099s that sales representative relied on in deciding to work for Alder [*id.* at ¶¶202–214]; securities fraud under Utah law and Section 10(b) of the Exchange Act [*id.* at ¶¶215–238]; and unjust enrichment [*id.* at ¶¶239–249].

Notably, it is unclear if any consideration was provided to the CAMs for releasing these claims. The only payments to be made to them under the Settlement Agreement arise out of their FLSA claims. Nothing in the Settlement Agreement mentions that any additional consideration will be provided to the CAMs for releasing these claims. As Judge Shelby has noted in *Cazeau*, 2020 WL 3605652, at *7-8, the Court will not approve a release of non-FLSA claims unless supported by "adequate additional compensation." *See also Marquez*, 2022 WL 4355298 at *14 (noting that courts typically will not approve broad releases but only releases of "wage-related claims").

In addition, the release in the Settlement Agreement purports to release persons other than persons or entities that could be considered "Employers" under the FLSA. For example, it releases all the Defendants' "shareholders, board members, partners, agents, employees, attorneys, insurers, [and] reinsurers" from

---

[10]    In the Third Amended Complaint, the term "Agreements" is defined as the "independent contractor agreement that provides for how the sales representative will be compensated." [ECF No. 157 at ¶72.]

all claims.  Yet it is hard to understand how some or all of these persons or entities could be considered an "Employer" under the FLSA.  As noted in *Cazeau*, the release should be limited to the named employers and then state and "any other person or entity associated with the [Employer] that was a[n] … 'Employer' as defined by FLSA."[11]  *See* 2020 WL 35605652, at *10, *11

In addition, in the initial Notice sent to potential Opt-In Plaintiffs there was no mention of the specific state law, common law, or securities law claims that were also being litigated.  The Notice stated that "this lawsuit is about whether Alder failed to comply with federal laws requiring the payment of overtime compensation for hours worked in excess of 40 hours in any workweek and minimum wage for all hours work[sic]."  [ECF No. 90-1 at 3.]   It further provided that "plaintiffs are seeking money damages for unpaid overtime compensations for the period of November 1, 2016, through the time of the trial or settlement."  [*See id*. at 4.]  There was no mention in that Notice that other claims may also have been at issue.

The Court notes that the first and only oblique mention to the CAMs of any other claims—other than the FLSA claims—is the inclusion in the Notice Settlement of the language of the proposed release, which does not describe the state law, common law, or securities law claims that will be released.  This lack of

---

[11]    Apparently recognizing this issue, the Settlement Agreement does identify that the parties released are "Defendants and any person or entity associated with Alder … who was their 'Employer' as defined by the FLSA."  [ECF No. 353-1 at ¶3.]  But the release then goes on to state that such persons include, but are "not limited to," the persons or entities discussed above.

notice dovetails into the Court's concerns as to informed consent from the CAMs to settle this action.

Further, the release purports to not only bind the NPs and the CAMs, but also Plaintiffs' counsel from "represent[ing], assist[ing], or encourage[ing] anyone else to pursue the putative class action claims." The parties should review the propriety of such a proviso. *See* Utah Code of Judicial Admin. Rule 13-5.6(b) (prohibiting an attorney from participating in offering or making "an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy").

### d. The Allocation of Costs of the Settlement Administrator

The Settlement Agreement appears to impose 100% of the costs to administer the settlement (estimated to be $10,000) solely upon the CAMs. [*See* ECF No. 353-1 at ¶6(c).]. Yet it appears that the NPs will enjoy the benefit of the settlement administrator's efforts. The settlement administrator will make all required disbursements, including those due the NPs, and also pay the NPs' counsel the contingency fees owed by the NPs, and provide Form 1099s and prepare payroll and income tax reports as necessary for the NPs. [*See* ECF No. 353-1 at ¶6(a)–(b).] Because the NPs are enjoying these benefits, it may be unreasonable to impose this financial burden solely on the CAMs.

### e. *Timing of the Settlement Payments*

Under the Settlement Agreement it appears that the initial $750,000 of the gross settlement amount will be paid by Alder to the settlement administrator within 14 days of the signing of the Settlement Agreement and the Court's final approval. [*See* ECF 353-1 at ¶4(a)(i).]

The remaining $500,000 will be paid in equal monthly installments of $100,000, beginning 30 days after the initial payment is made. [*See id.* ¶4(a)(ii).] Thus, the full amount of the gross settlement amount will not be paid until 6 months and 14 days after the Settlement Agreement is approved by the Court.

Despite the delay in fully funding the settlement, the Settlement Agreement provides that upon receipt of the first $750,000 payment, the settlement administrator will immediately pay $600,000 to the NPs, and a percentage of that amount to their counsel subject to their contingency agreement. [*See id.* at ¶6(a).] And ten days after making that payment, the remainder of the amount due the NPs that is "associated with the Individual Claims portion of the Gross Settlement Amount" will be paid out to the NPs in the same manner. [*See id.* at ¶6(b).] Although not directly referenced, this amount would appear to be up to the $150,000 remaining from the initial $750,000 paid by Alder.

The Settlement Agreement does not identify when the additional $250,000 due to the NPs will be paid. Presumably, it be paid out from the five monthly $100,000 payments due from Alder. But most concerning, the Settlement Agreement does not identify how or when this additional NP payment will be paid

and how it will be apportioned with regard to the payments to be made to the CAMs.  Nor does the Settlement Agreement spell out when the $250,000 in payments to the CAMs are to begin.

It is not clear to the Court why the NPs are being paid in advance of the CAMs.  Many similar settlements commence making payments to all eligible recipients at the same time.  Moreover, if any portions of the payments to the NPs are attributed to the FLSA claims, any temporal preference may be unreasonable.  Further clarification as to the sequencing of payments may be necessary.[12]

### f.   Timing for Cashing Checks

Under the Settlement Agreement checks to the CAMs "must be cashed within sixty (60) days" after they are issued.  [ECF No. 353-1 at ¶7(b).]  And all checks will "become void" 60 days after they are issued.  [*Id.* at ¶7(c).]  Generally, under the U.C.C. the default time to cash checks is 180 days.  *See* U.C.C. § 4-404.  It is not explained why such a short time is warranted here.

Further, under the Settlement Agreement, all amounts for checks so voided will revert to the gross settlement amount and may be redistributed pro rata (and less remaling fees) to the CAMs who already cashed their checks.  [*See* ECF No. 353-1 at  ¶7(c).]  Relatedly, the settlement administrator appears to have discretion to determine if resending additional reversionary checks is not "economically feasible," or to determine if the costs to do so will exceed the amount of the

---

[12]    The sequencing of these settlement payments, perhaps in recognition of the settlement of the NPs individual claims, provides further support for the Court's position that this settlement should be structured solely as a FLSA claims settlement.

reversionary settlement amounts, and, if so, the settlement administrator will pay such amounts to a charity agreed to by the NPs counsel. [*See id.* at ¶7(c).] Under the Settlement Agreement, if any amounts are paid to charity Alder will be entitled "to any tax deductions associated with any such amounts paid to the charity." [*Id.* at ¶7(c).]

If these or similar provisions remain in any revised agreement, the parties should be prepared to address why they are fair and reasonable.

g.  *Allocation of Attorneys' Fees and Costs*

Although just 20% of the gross settlement amount of $1,250,000 is attributed to the CAMs' FLSA claims [*see* ECF No. 353-1 at ¶4(c)(ii)], the CAMs are paying attorneys' fees "up to … 33.33%" of the settlement amount allocated to the FLSA claims. [*Id.* at ¶4(c)(iii)]. The Settlement Agreement does not disclose what percentage rate the NPs will be paying in attorneys' fees. All that is mentioned is that the NPs will pay fees "in accordance with their contingency fee agreement." [*See id.* at ¶6(a).] If that rate is lower than 33.33% that may create a fairness issue.

It is also not disclosed how counsel has apportioned its work as between the FLSA claims of the CAMs, the FLSA claims of the NPs, and any of the individual or class claims. It may be that much of the heated discovery and motion practice in this case did not concern FLSA issues, but rather more time was spent on the individual or class claims issues. Counsel should closely examine the litigation

conduct to determine if the fees incurred for some of that conduct may be fairly charged to the FLSA claims and against the CAMs.[13]

In addition, there is a lack of detail in the fees' affidavits included with the Joint Motion. For example, and among other things, there is no breakdown by specific attorney with that attorney's rate and hours worked; no breakdown of costs and expenses for filing fees, service fees, mediation fees, computer research (an amount that may already be factored into the hourly billing rates for counsel), copy

---

[13]    Included among the litigation conduct that should be reviewed are the following:

   a.   The filing an amended complaint following a motion to dismiss that challenged the FLSA claim but also focused on the state law, common law, and securities law claims;

   b.   Defending against a motion to dismiss the amended complaint that mostly challenged the state law, common law, and securities claims;

   c.   A stipulated dismissal of one of the named plaintiffs from this action;

   d.   How any apportionment of fees considers the court's prior order awarding fees to Plaintiffs' counsel [see ECF No. 106];

   e.   Expenses and fees incurred in connection with the preparation and filing of the Second and Third Amended Complaints, each of which was filed after the FLSA collective was certified and consents were received from the CAMs;

   f.   Expenses and fees related to Alder's counterclaims filed solely against the NPs [see ECF No. 164]. On this issue, the record appears to indicate that non-party Vivint may have paid the fees associated with these counterclaims. [See ECF No. 218 at 2.];

   g.   How was Vivint's role in this action factored into any fee or damages apportionment? Or into the contingency fee agreement between the NPs and counsel?;

   h.   Defending against a motion for partial summary judgment [see ECF No. 265] that was more than ½ devoted to the state law, common law, and securities claims issues;

   i.   The preparation, filing, and briefing of a motion for sanctions that appears to relate more to issues concerning the NPs individual claims; and

   j.   the discovery motion practice that resulted in at least 11 judicial decisions and orders [see, e.g., ECF Nos. 83, 161, 189, 195, 197, 200, 222, 223, 230, 231, 331], which may have had more to do with the NPs individual claims, or the class claims, than the FLSA claims.

and printing, postage, travel, transcripts, and collective notice expenses.  Nor do the affidavits identify how these costs were apportioned between expenses incurred for the individual and class claims versus the FLSA claims.

### h. Confidentiality, Non-Disclosure and Non-Disparagement Provisions

The Settlement Agreement has a confidentiality provision that states that the Settlement Agreement and its terms are "strictly confidential" and that all parties shall not disclose or make any statement about the Settlement Agreement, any terms of the Settlement Agreement, or "this Action."  [*See* ECF No.353-1 at ¶14.]  The parties may only state that "the matter has been resolved to the parties mutual satisfaction."  [*See id.*]  Breach of this provision by the NPs may be punished by a liquidated damages payment equal to any amount the breaching party received under the Settlement Agreement.  [*See id.* at ¶16.]  This damages provision, however, is not mutual.

The parties should consider the propriety of these provisions.  First, the Settlement Agreement has been publicly filed on the docket [*see* ECF No. 353-1]. It is hard to understand how someone can be penalized for disclosing a public document.  Although some courts have approved confidentiality provisions that seek to restrict the settling plaintiffs from actively contacting media or using social media to disclose the settlement terms, *see Lola v. Skadden, Arps, Slate Meagher & Flom, LLP*, No. 13-cv-5008, 2016 WL 922223, at *2 (S.D.N.Y. Feb. 3, 2106), many other courts have refused FLSA settlement confidentiality provisions.  *See Guerro-Alonso v. West 54 Dell Corp*, No. 14-cv-7247, 2015 WL 3777403, at *1 (S.D.N.Y May

15, 2015) (noting that a confidentiality provision in a FLSA settlement is "contrary to public policy").

Indeed, Judge Shelby noted the same in *Cazeau* when he declined to approve a FLSA settlement that had a similar confidentiality clause, noting that it was "impermissible" because it "contravenes the legislative purpose of the FLSA," and also noting, among other things, that the settlement had been publicly filed. *See Cazeau*, 2020 WL 3605652, at *7 (cleaned up); *see also Oates v. Kinder Morgan Energy Partners, L.P.,* No. CIV. 19-1171, 2022 WL 18673322 (W.D. Okla. Jan. 18, 2022) (denying approval of FLSA settlement agreement and noting that confidentiality provisions in FLSA settlements have been held to "contravene the purpose of the FLSA" and citing cases in agreement).

In addition, the Settlement Agreement has a vague "Non-Disparagement" provision. Among other concerns, it appears that this provision only binds the NPs, leaving the Defendants free to disparage the NPs (and the CAMs) as they wish. Further, the provision has no carve out that would allow the NPs to make truthful statements regarding their experiences litigating this action. *See Horta v. Kings Logistics, L.L.C.*, No. 22 Civ. 2508, 2023 WL 11862137, at *7 (E.D.N.Y. Jul. 5, 2023) (recognizing that a mutual non-disparagement provision that contains such a carve out may be approved).

## CONCLUSION

Going forward the Court needs to be presented with more sufficient and detailed information to enable it to conduct a proper review of the fairness and

reasonableness of any collective action settlement of the FLSA claims. The parties should review any proposed settlement agreement—and not just those provisions discussed above—with the goal of presenting a settlement that will pass a fairness and reasonableness assessment.

In doing so the parties have a free hand in recasting their agreement. The Court is not interjecting itself into the parties' settlement negotiations or attempting to rewrite the settlement, or imposing terms to which they may not agree. *See, e.g., Fisher v SD Protection Inc.*, 948 F.3d 593, 606 (2d Cir. 2020) (holding that "even though a district court has a duty to review a[] FLSA settlement for reasonableness to prevent any potential abuse, this does not grant the court authority to rewrite contract provisions it finds objectionable"). Rather, the Court is merely giving the parties an opportunity to revise their settlement.

Accordingly, **IT IS THEREFORE ORDERED** that the Joint Motion for Approval of Collective Action Settlement [ECF No. 353] is **DENIED WITHOUT PREJUDICE;** and

**IT IS FURTHER ORDERED** that that the parties are directed to file a joint status report with the Court within 30 days.

DATED this 7th day of October 2025.

BY THE COURT:

Clark Waddoups
United States District Judge

-24-